583 So.2d 443 (1991)
TRANS-GLOBAL ALLOY LIMITED, John D. Wyatt, and F. Paul Naquin, Jr.
v.
FIRST NATIONAL BANK OF JEFFERSON PARISH.
Nos. 90 C 1848, 90 C 1810.
Supreme Court of Louisiana.
June 21, 1991.
*444 Louis G. Shushan, Rader Jackson, Shushan, Meyer, Jackson, McPherson & Herzog, Mack E. Barham, Robert E. Arceneaux, Lee A. Archer, New Orleans, for defendant-applicant.
Edward F. Kohnke, IV, James H. Brown, Jr., Walter F. Marcus, III, Lemle & Kelleher, New Orleans, for plaintiff-respondent.
No counsel listed for Allied Bank of Texas and John R. Spratt.
CALOGERO, Chief Justice.[*]
These are consolidated appeals from a decision rendered in a suit for breach of contract, breach of fiduciary duty, and wrongful misrepresentation. A jury found the defendant bank liable and awarded damages of $1,079,642 to the plaintiff corporation, as well as damages of $324,000 and $17,000 to the individual plaintiffs, John D. Wyatt and F. Paul Naquin, Jr., who were officers and shareholders of the corporation. The trial court first entered judgment in accordance with the jury's verdict, and awarded legal interest from the date of judgment.
The defendant, First National Bank of Jefferson (FNBJ), filed motions seeking a mistrial, new trial, judgment NOV, or remittitur, while the plaintiff, Trans-Global, moved to amend the judgment to have legal interest awarded from the date of the breach, or at the latest, from the date of judicial demand. After hearing arguments on those motions, the court rendered an amended judgment granting FNBJ's motion for judgment NOV and reducing the damages awarded to Trans-Global to $500,000; vacating the awards to the individual plaintiffs on the basis that they had no right of action for breach of an obligation owed to the corporation; and denying Trans-Global's motion to amend the judgment regarding the commencement of legal interest.
The court of appeal reversed the trial court's reduction of Trans-Global's damages, and reinstated the jury award of $1,079,642, 564 So.2d 697. It upheld the lower court's rulings on the dismissal of Wyatt's and Naquin's individual claims and on the award of interest only from the date of judgment. Both parties have had writs granted by this court. Trans-Global seeks *445 reversal of the decision insofar as it denied prejudgment interest. The defendant, FNBJ, asks this court to reverse that part of the decision holding it liable and assessing damages for breach of a contractual or fiduciary duty owed to Trans-Global. For the reasons recited below, we now reverse the court of appeal, reinstate the trial court award of $500,000, and award legal interest from the date of judicial demand.

Facts
In July 1981, plaintiffs John Wyatt and J. Paul Naquin formed a corporation, Trans-Global Alloy Limited, for the purpose of importing oilfield products manufactured in China at much lower prices then could be obtained in the United States, and selling them to companies in the oil industry in this country. On July 7, 1981, Trans-Global signed a "master distributorship agreement" with China Corporation of Shipbuilding Industry (CCSI), which designated Trans-Global the sole American importer of products manufactured by the Chinese firm. On July 24, 1981, Trans-Global and CCSI executed a letter of intent to enter into a long-term contract for the purchase of pipe couplings.
The next month, in August 1981, Trans-Global obtained a working capital loan of $50,000 from Continental Bank through its vice-president and loan officer John Spratt, with whom Wyatt had an existing banking relationship. (Continental merged with FNBJ on June 30, 1982, and thereafter continued operations under the FNBJ name. Spratt's position with the bank remained the same with the merged banks. We will refer to the banks as FNBJ.)
On November 6, 1981, Trans-Global and CCSI executed a contract in which Trans-Global agreed to purchase two million pounds of casing couplings manufactured by CCSI. The couplings were to be delivered in ten monthly shipments of 200,000 pounds each, with the first shipment scheduled to leave Shanghai by the last day of May, and subsequent shipments to follow monthly. The contract provided that the first five shipments would consist of blank, or unthreaded couplings, while the remaining shipments were to be of threaded couplings. Trans-Global was to provide CCSI with specifications, drawings, and other information which would allow it to manufacture the couplings in accordance with American Petroleum Institute (API) standards.
The total price Trans-Global agreed to pay CCSI for the ten shipments of couplings was $1,852,000. Trans-Global also agreed to furnish security for payment by providing an irrevocable, revolving letter of credit in the amount of $190,000, which would automatically be restored to the original amount fifteen days after each shipment.[1] CCSI was not obligated to ship any couplings until the letter of credit was posted. Further, if there were any discrepancies between the terms of the contract and those of the letter of credit, or if Trans-Global failed to make payment according to the conditions of the contract, CCSI could cancel the contract without penalty, and Trans-Global would be obligated to pay stipulated amounts to cover CCSI's expenses and losses.
Two months after Trans-Global executed the contract with the Chinese, it entered into a second contract with Pel-Star Couplings, Inc., a Lafayette firm, in which Pel-Star agreed to purchase the entire first year's shipment of two million pounds of couplings for $3,042,000. The terms of Trans-Global's contract with Pel-Star tracked those of its contract with CCSI. Pel-Star agreed to purchase the couplings in ten equal monthly shipments, with the first arriving in the United States by June 30, 1982, approximately one month after it *446 was scheduled to leave Shanghai. Pel-Star also agreed that the first five shipments would consist of blank couplings, while the last five shipments would consist of threaded couplings. In order to guarantee that it would meet its payment obligation, Pel-Star was to post an irrevocable revolving letter of credit in Trans-Global's favor in the total amount of $3,050,000. That letter of credit would in turn be assigned to FNBJ to secure Trans-Global's debt.
On March 7, 1982, Pel-Star's bank, First National Bank of Lafayette (FNBL), issued in favor of Trans-Global its irrevocable Letter of Credit # 793 in the total amount of $3,050,000. The letter provided for ten consecutive monthly drafts of $305,000. The first of the drafts would be made when the letter's holder presented shipping documents to the Lafayette bank, stating that the couplings had been loaded on board ship and that the shipment was covered by marine insurance, with the bank (FNBL) named as loss payee. Subsequent drafts, however, were to be subject to the following requirements:
An affidavit of an officer of Continental Bank, Harvey, Louisiana, which affidavit states that Continental Bank is the holder of the Letter of Credit no. 793, along with the following documents: Inspection report by licensed API inspector stating random sampling of blank couplings have met established plans and specifications. In addition, certificates shall contain material specification, grade and chemical composition in compliance with the API standards and threaded couplings shall contain the API monogram. Letter from freight forwarding firm stating goods have been accepted and cleared customs, Port of New Orleans or Port of Houston.
Another provision of the instrument required that the FNBL letter of credit be drafted upon for the first shipment by June 9, 1982, with an automatic fifteen day extension to June 24, 1982. The letter would then automatically return to its original amount ($305,000) to cover the next draft.
On March 25, 1982, loan officer Spratt submitted an internal loan application to the FNBJ loan committee, requesting the issuance of a revolving letter of credit for Trans-Global in the amount of $190,000 (or $1.9 million in total), which would cover payment to CCSI for the ten monthly shipments of couplings. The loan was to be secured by the assignment to FNBJ of FNBL's Letter of Credit # 793, the continuing guarantees of Wyatt, Naquin, and Oilfield Tubulars, Inc. (a company owned by Wyatt which supplied pipe to oilfield contractors), and the designation of FNBJ as the beneficiary on an insurance policy on Wyatt's life in the amount of $500,000. Both parties acknowledge that the loan committee thereupon refused to issue a revolving letter of credit, and required additional collateral from the plaintiffs. (Although the bank at first demanded an additional $100,000 in cash, it ultimately agreed to accept instead a second mortgage on Wyatt's house.) Trans-Global contends, however, that Wyatt was told by Spratt that the bank was willing to issue ten monthly letters of credit that would "accomplish the same thing," while FNBJ maintains that it made a commitment to issue ten consecutive letters of credit conditioned on performance (i.e., after it had been paid for the last draft and the previous shipment of couplings had arrived in the United States). In any event, on April 9, 1982, FNBJ and Allied Bank of Texas,[2] on Trans-Global's behalf, issued the first $190,000 letter of credit to the Chinese.
On May 29, 1982, in accordance with its contract with Trans-Global, CCSI loaded the first consignment of couplings on board ship in Shanghai. On June 24th, FNBJ presented to First National Bank of Lafayette the shipping documents required by FNBL's Letter of Credit # 793 in order to make the first draft on the Lafayette bank's letter of credit. FNBL paid the amount of the draft, $292,289.24, directly *447 to FNBJ, which, after deducting the amount necessary to repay itself for its own first letter of credit, distributed the remaining funds (approximately $100,000) to Trans-Global.
On July 17th, the first shipment of unthreaded couplings arrived in the United States, where, on July 19th, it was tested and found to be in compliance with API standards. Two days later the Allied Bank of Texas and FNBJ issued their second letter of credit to CCSI for $190,000. Ten days after the posting of the letter, on July 31, CCSI placed the second shipment on board for delivery to the United States. Under the Trans-GlobalCCSI contract, the second consignment of couplings was to have been shipped by June 30, 1982, thirty-one days earlier.
In order for the delivery schedules specified in Trans-Global's contracts with CCSI and Pel-Star to work, FNBJ would be required to issue a letter of credit every month before receipt of, and payment for, the prior shipment. Trans-Global contends that throughout the month of May Wyatt continually urged Spratt to have FNBJ issue the second letter of credit so that CCSI would be able to book shipping space and ship the second consignment of couplings so as to have it arrive in time to facilitate a timely second draft on FNBL's letter of credit. Wyatt testified that it was not until the end of that month that he was informed by Spratt that the bank would not issue a second letter of credit until it had been paid for its first letter. FNBJ, on the other hand, maintains that Wyatt was informed in early April that issuance of another letter would only follow upon payment for its first letter and the arrival of the first shipment in the United States.
The second shipment of couplings arrived in Houston on September 17, 1982, seventeen days after it was to have been delivered to Pel-Star under the Trans-Global Pel-Star contract. On September 28, after the couplings had been tested and evidently found to be in compliance with API specifications, representatives of Trans-Global and FNBJ traveled to Lafayette to attempt to make the second draw on the FNBL letter of credit. An officer of FNBL then contacted the president of Pel-Star, David Fitzgerald, (who was also an FNBL board member), and informed Fitzgerald that the bank had a 72 hour option period in which to decide whether to honor the draft. Over a month earlier, Pel-Star had sent Trans-Global a letter cancelling its contract obligation to accept the second through tenth shipments, demanding rescission of the first shipment for the stated reason that the couplings did not meet the required specifications, and putting Trans-Global in default under the contract. When contacted by FNBL, Pel-Star filed for and was granted injunctive relief to prevent the bank from honoring the draft. Meanwhile, FNBL refused to accept the draft for the reason that its $3 million revolving letter of credit had expired on July 24th, 1982, when FNBJ had failed to make the second draft by that date.
Trans-Global and FNBJ then filed suit against the Lafayette bank. After protracted litigation, the Third Circuit Court of Appeal decided that the $3 million letter of credit had indeed expired on July 24th. See Trans-Global Alloy, Ltd. v. First National Bank of Lafayette, 490 So.2d 769 (La.App. 3d Cir.1986).[3] In the interim, FNBJ had cut off all credit to Trans-Global. Although Trans-Global managed to obtain other financing, it was unable, in the by-then depressed Louisiana economy, to sell the couplings which it had purchased from CCSI. The company was placed in bankruptcy by its creditors in December *448 1984, and one year later, in December 1985, filed the present suit against First National Bank of Jefferson.

Assignments of Error

Defendant's First Assignment of Error
In its first assignment of error, FNBJ maintains that the court of appeal improperly applied a manifest error standard of review. It argues that because erroneous jury instructions and other trial court legal errors tainted the verdict, the appellate court should have reviewed the case de novo.
First, FNBJ notes that it was held liable on the basis of the jury's answer to a single interrogatorydid the bank "breach any contractual or fiduciary obligation made between it and TGA." The bank contends that, as a matter of law, it had no fiduciary obligation to Trans-Global, either as a creditor or as a pledgee holding FNBL's letter of credit as collateral. It concludes that because there is no way to tell which obligation (contractual or fiduciary) the jury believed FNBJ to have breached, its verdict must be disregarded. In addition, the bank contends that the trial court's instruction regarding fiduciary duty was misleading and coercive.[4]
A party's right to assign as error the trial court's instructions to the jury is governed by Louisiana Code of Civil Procedure article 1793. Paragraph C of that article provides:
A party may not assign as error the giving or the failing to give an instruction unless he objects thereto before the jury retires to consider its verdict, or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection.
In this case, there is no indication in the record that FNBJ objected to either the instruction regarding fiduciary duty (other than to the words "and became worthless" in the second line, which is not relevant to its argument concerning the existence of a fiduciary duty), or to the interrogatory submitted to the jury on that issue.[5] Not only did the bank fail to object, but through the testimony of its own witnesses and the argument of its counsel, FNBJ in effect invited the jury instruction it now assigns as error.[6] Moreover, as will be evident in the next section of this opinion, we do not find that the jury instructions or interrogatories in this case contain the kind of plain, fundamental error which might tempt us not to heed the language of article 1793.
FNBJ maintains that the trial court committed a second legal error in allowing testimony by banking experts that the bank owed a fiduciary duty to Trans-Global. It contends that the existence of a duty is a legal determination, not a question of opinion, and that opinion testimony regarding ultimate issues of law is prohibited. Again, however, FNBJ failed to object contemporaneously to the testimony, thereby waiving its right to object, on appeal, to the introduction of that evidence. See Temple v. Liberty Mutual Ins. Co., 330 So.2d 891 (La.1976) (failure to object to prejudicial *449 statements constitutes waiver of right to complain of them on appeal); Succession of Franz, 242 La. 875, 139 So.2d 216 (1962) (appellate court is without right to pass upon the admissibility of evidence which has been offered and received at trial without objection). It might also be noted that the testimony which FNBJ now argues has tainted the jury verdict was elicited from its own expert witnesses, after the fiduciary issue was first raised by its own counsel.
Finally, FNBJ asserts that the jury was improperly coerced into reaching its verdict by a prohibited "Allen" charge"language used by the court addressed to the jury [that] ... may have had the effect of coercing them to agree upon a verdict." State v. Nicholson, 315 So.2d 639 (La. 1975). The bank bases this allegation on the following facts: After six days of trial, the jury began its deliberations in this case at approximately 4:00 p.m. on November 22, 1988, two days before Thanksgiving. At approximately 7:30 p.m., the jury returned to the courtroom. Upon being asked by the judge what explanation had been given to the bailiff, the foreman replied that one of the other jurors had "mentioned that we were at an impasse, had a few questions and wanted to know if we could get something to eat if we were going to be here much longer." After ascertaining that the jurors did not mean that they had questions to ask of him, but simply wanted to continue to deliberate, the judge responded "I'm going to do this. I'm going to send you back. If you do not reach a verdict, as I say, it's now 7:30. If you have not reached a verdict by eight o'clock, then I'm going to bring you back at nine o'clock tomorrow morning and continue your deliberations. Okay?" The jury returned its verdict at 7:52 p.m. that night.
FNBJ contends that the judge's response to the jurors' request was coercive in that it was given two days prior to Thanksgiving, and that "several jurors had apparently planned out of town trips for the next day." Therefore, returning the next morning for further deliberations "could require that they miss their Thanksgiving holiday."
We do not agree that the trial judge's comments to the jury in this case constitute the equivalent of the Allen charge prohibited by this Court in State v. Rodman, 208 La. 523, 23 So.2d 204 (1945) and State v. Nicholson, 315 So.2d 639 (La.1975). The charges in those cases were directed toward avoiding a mistrial by "dynamiting" a hopelessly deadlocked jury into achieving a verdict. There is no indication here that the jury was deadlocked, or that the judge was concerned about the possibility of a mistrial. Indeed, given the brevity of the exchange between the judge and the foreman, there is no way to tell what stage the jury had reached in its deliberations. Further, there is nothing in the record to support FNBJ's surmise that some of the jurors had plans to leave town the next day, and therefore had forced a verdict in order to avoid missing the Thanksgiving holiday, two days later. In the absence of a greater showing of possible or likely prejudice, we cannot ascribe an impermissibly coercive effect to the judge's comments in this case.
In conclusion, we find no merit in the defendant's first assignment of error, that the trial court legal errors discussed above require this court to conduct a de novo review.

Defendant's Second Assignment of Error
In FNBJ's second assignment of error, it argues that the bank did not breach either a fiduciary or a contractual duty to Trans-Global. FNBJ strenuously contends that it never committed to issuing a revolving letter of credit to finance all ten shipments of couplings, or to its virtual equivalent, ten consecutive conventional letters of credit, each issued one month apart. First, it asserts that Trans-Global's claims are defeated by the fact that it neither asked for nor received any commitment in writing. The bank maintains that not only would experienced businessmen expect to have a written commitment in an international trade deal of this size, but that such a writing is required by LSA-R.S. 6:1122 *450 for a borrower to maintain an action on this kind of credit transaction.[7] FNBJ acknowledges that the statute was adopted after this action arose, but contends that, as a procedural enactment, it should be applied retroactively.
FNBJ further argues that Trans-Global cannot rely on the bank's internal loan application prepared by Spratt on Trans-Global's behalf as the requisite written commitment. Although that application was checked ("/") by the loan committee as approved, FNBJ notes that the word "revolving" was struck through, and that the application contained an amended expiration date of June 9, 1982, and listed the amount of the loan as $190,000. Further, one of the specific items of collateral listed in the application is the assignment of FNBL's revolving irrevocable letter of credit # 793 "in the amount of $305,000." FNBJ contends that if the application was intended to reflect a loan to cover all ten shipments, the value of the FNBL letter of credit would have been listed as $3,050,000.
We find no merit in FNBJ's argument that a written commitment was necessary in order for the bank to be bound to finance all ten shipments. As FNBJ acknowledges, LSA-R.S. 6:1121-6:1123 did not take effect until 1989, approximately four years after this suit was filed, and more than seven years after the events giving rise to this suit took place. Although Louisiana Civil Code article 6 provides that substantive laws apply prospectively only, while procedural and interpretive laws apply both prospectively and retroactively, unless there is legislative expression to the contrary, we need not decide into which category LSA-R.S. 6:1121-6:1123 falls. This Court has often noted that even procedural and interpretive laws will not be applied retroactively when such application would operate unconstitutionally to disturb vested rights or impair contracts. See, e.g., Lott v. Haley, 370 So.2d 521 (La.1979); Ardoin v. Hartford Accident & Indem. Co., 360 So.2d 1331 (La. 1978). Therefore, LSA-R.S. 6:1121-6:1123 cannot be applied retroactively to divest Trans-Global of any contractual rights it may have had in regard to its agreement with FNBJ. Further, according to testimony given by FNBJ's president, Elton Arceneaux, it was not normal banking practice at that time to put commitments such as this in writing.
FNBJ next submits that even if a written commitment was not required, Trans-Global had the burden of proving that both parties had orally agreed to substantial elements of the contract, by "at least one witness and other corroborating circumstances." La.C.C. art. 1846. The bank argues that Trans-Global failed to carry that burden. It cites testimony by both Wyatt and Naquin that they understood that Spratt did not have the authority to issue a revolving letter of credit, and that the decision would have to be made by the loan committee. The bank also asserts that the testimony of the plaintiff's witness, Don Weekly, former FNBJ senior vice-president and member of its loan committee, only established that he and Spratt were in favor of a $1.9 million commitment, not that the bank in fact made such a commitment.
FNBJ further claims that the documentary evidence cited by Trans-Global, including the amended loan application, a memo from Spratt to Weekly concerning the loan commitment, and letters between Spratt and Little (an officer at Allied Bank of Texas), actually support its position that the commitment was for only one letter of credit. It also cites the testimony of banking expert James Byrne, who stated that he did not consider the FNBL letter of credit to be good collateral because it was subject to performance by Trans-Global and to FNBL's discretion. Byrne testified that it would have been prudent to ask for more collateral for a single $190,000 loan than FNBJ obtained altogether from Trans-Global, Wyatt, and Naquin. FNBJ concludes that Trans-Global produced no witness or any corroborating evidence to *451 prove that the bank made a $1.9 million commitment.
After reviewing the record, however, we conclude that the jury could reasonably have found that Trans-Global established the existence of a $1,900,000 commitment by FNBJ through testimony and corroborating evidence. Under our jurisprudence, the plaintiff can be the one credible witness, and the corroborating circumstances need only be general in nature. Taylor v. Dowden, 563 So.2d 1294 (La.App. 3d Cir.1990); Feazel v. Feazel, 471 So.2d 851 (La.App. 2d Cir.1985). Furthermore, testimony of a second witness may constitute "other corroborating circumstances." Dunham v. Dunham, 467 So.2d 555 (La. App. 1st Cir.), writ denied, 469 So.2d 989 (La. 1985).
In this case, Wyatt and Naquin both testified that from the inception of the plan to import couplings from China, the bank, through Spratt, was privy to the details of all of their transactions, including Trans-Global's respective contracts with CCSI and Pel-Star. They also testified that they were continually encouraged to believe that the bank would commit to issuing a revolving letter of credit which Trans-Global had contracted with the Chinese to provide. They stated that even when, after the March 25, 1982 loan committee meeting, they were informed that a revolving letter would not be forthcoming, Spratt told them that the bank would commit to issuing ten consecutive letters of credit which would accomplish the same purpose. Notwithstanding Spratt's contrary testimony that he had told Wyatt in early April that issuance of a second letter of credit would be premised on repayment to FNBJ for its first letter, the jury was obviously free to give credence instead to Wyatt's and Naquin's statements.
Although Wyatt and Naquin admittedly knew that the final decision on the bank's commitment would have to be made by the loan committee, they had traditionally been informed of bank actions through Spratt. Spratt was a senior vice-president and loan officer with whom Wyatt had had a long-term banking relationship. It would not have been unreasonable or unusual for customers in their position to rely on assurances that a revolving letter of credit would be issued, or to believe a statement that the loan committee's decision to issue instead ten consecutive letters of credit would "accomplish the same thing."
Additionally, there was testimony by Don Weekly, the bank's former senior vice-president and "number-two man," and the only member of the loan committee to testify, that he knew that the contract with CCSI depended upon a continuous flow of cash payments to China, each payment followed by a shipment of couplings to the United States, and that if any part of this chain was interrupted, the arrangement would fall apart. He also testified that it was intended that FNBJ would issue ten consecutive letters of credit.
Although the documentary evidence presented is ambiguous, it could reasonably have been interpreted by the jury as supporting the plaintiffs' position that FNBJ had made a commitment to finance the entire ten month transaction. For example, although the loan committee scratched out the word "revolving" on the loan application prepared by Spratt on Trans-Global's behalf, and penciled in the words "Amended: L/C will expire 6/9/82," the Committee left untouched the loan maturity date of "Demand/Feb 1983," as well as the stated purpose of the loan: "Note to back Letter of Credit to import couplings. Shipments will arrive every month for 10 months (1,900,000) commencing May, 1982." Further, under the Credit EvaluationCredit History section, the application provides that although the FNBL letter of credit can be drafted upon shipping documents for the first shipment, the "[r]emaining nine (9) shipments will draft upon arriving Port of New Orleans or Houston."
Trans-Global also introduced a memorandum prepared by Spratt after the loan committee's action, which refers to the bank's "first" letter of credit, and states that Wyatt would have assets available to pay for "subsequent" and "future" letters of credit to be issued by FNBJ. Further, the affidavit of FNBJ officer Don Lathrop, executed *452 at the time the bank attempted to make the second draft against the Lafayette bank's $3 million letter of credit, stated that FNBJ was "authorized to make their first of nine consecutive drafts."
Finally, the jury could have reasonably found the amount of collateral required by FNBJ to be more than the bank would have requested simply for a $190,000 loan. FNBJ had very little exposure on its first letter since it was secured by an irrevocable letter of credit from the Lafayette bank, payable simply on presentment of documents and not upon receipt of the couplings. Further, under the terms of the contemplated shipment and payment schedules, FNBJ would never have at risk more than two $190,000 letters of credit at any time. Yet, in addition to FNBL's $3 million letter of credit, the bank required as collateral the personal guarantee of Wyatt, who had a net worth of $500,000; the guarantee of Wyatt's other corporation, Oilfield Tubulars, which held inventory valued at $400,000; a second mortgage on Wyatt's home which had an equity of $75,000; the personal guarantee of Paul Naquin; and the issuance of a $500,000 policy of insurance on Wyatt's life naming FNBJ as beneficiary.
In conclusion, we find that the testimony of Trans-Global's witnesses, the references to multiple shipments in the documents introduced into evidence, and the amount of collateral held by FNBJ could reasonably constitute proof of a contract "by at least one witness and other corroborating circumstances" as required by Civil Code article 1846.
We have concluded that there was no manifest error in a finding that FNBJ breached a contractual duty to Trans-Global. However, the jury interrogatory on which FNBJ's liability was based leaves open the possibility that the jury found instead that it was a fiduciary obligation which FNBJ breached. We therefore now consider whether that finding would have been manifestly erroneous.
FNBJ first contends that under the general principles of lender liability and banking law, a creditor and debtor have an arm's length relationship which imposes no independent duty of care, and specifically, no fiduciary duty, on the lender. The bank argues that this general rule is followed in Louisiana, citing Busby v. Parish National Bank, 464 So.2d 374 (La.App. 1st Cir.), writ denied, 467 So.2d 1132 (La.1985).
FNBJ further maintains that as a pledgee, it could be held liable only for the loss or decay of the pledged item which occurred through its fault. See La.C.C. art. 3167. The bank acknowledges that in protecting the pledge, it was required to act as a prudent administrator, but contends that its duty of care did not extend to taking action which was contrary to its own interests. It argues that its refusal to issue its own second letter of credit until the first shipment of couplings arrived had been both prudent and in accord with its contractual obligations to Trans-Global and its fiduciary duty to its shareholders. Finally, FNBJ asserts that it took years of litigation to establish that FNBL's letter of credit had expired on July 24, 1982, and that the bank had not been unreasonable in concluding, mistakenly, as it turns out, that the letter would not expire on that date.
After a review of the record and the applicable statutory and jurisprudential authority, however, we conclude that a jury finding that FNBJ breached a fiduciary duty would not be manifestly erroneous. Although the creditor-debtor relationship does not normally impose an independent duty of care on the part of the creditor, that relationship may give rise to such a duty in certain circumstances. In Baylor v. Jordan, 445 So.2d 254, 256 (Ala.1984), the Alabama Supreme Court found a fiduciary duty to exist where a customer "reposes trust in a bank and relies on the bank for financial advice, or in other special circumstances." See also High v. McLean Financial Corp., 659 F.Supp. 1561 (D.D.C.1987) (plaintiffs' claim that fiduciary duty existed by virtue of their loan application, processing fees, and defendants' promises to them held to support an inference of such a duty); Barnett Bank of West Florida v. Hooper, 498 So.2d 923 (Fla.1986); T. Bucknell, Jr., S. Goodwin, & M. Stoddard, Jr., Lender Liability: Theory *453 and Practice § 1.21. The court in the case cited by FNBJ, Busby v. Parish National Bank, did not reach a contrary conclusion. Rather, the court found that on the facts of that case, no fiduciary duty was imposed by law or as a result of a special relationship of trust between the parties (the latter indicated by the fact that the plaintiffs were accompanied by counsel in their meetings with the bank).
Further, in this case FNBJ held in trust, as pledgee, Trans-Global's letter of credit from FNBL. It has been recognized that
from the very nature of the transaction there arises a trust relationship between the pledgor and pledgee with attendant duties to protect the debt or the obligation and the collateral. The pledgee is presumed to act for the pledgor's interest as well as for his own, although their interests are not identical.
In re Pan American Life Ins. Co., 88 So.2d 410, 415 (La.App. 2d Cir.1956); see also Commercial National Bank in Shreveport v. Parsons, 144 F.2d 231 (5th Cir.1944), reh'g denied, 145 F.2d 191, cert. denied, 323 U.S. 796, 65 S.Ct. 440, 89 L.Ed. 635 (1945) (very nature of transaction between pledgor and pledgee gives rise to a trust relationship with consequent duty to protect the debt or obligation and collateral).
The duty of care imposed on the pledgee in this trust relationship, is, as FNBJ acknowledges, that of a prudent administrator or paterfamilias. See Slovenko, Of Pledge, 33 Tul.L.Rev. 59 (1958). More specifically, Civil Code article 3167 provides that the pledgee is liable for the loss or decay of the pledge that happens through his fault. That provision is precisely the instruction which the trial judge gave to the jury regarding fiduciary duty. Therefore, a finding by the jury that FNBJ violated a fiduciary duty would necessarily have been based on its belief that the FNBL letter of credit suffered "loss or decay" while in FNBJ's care and as the result of the bank's fault. It has clearly been established that the letter of credit expired and lost its value while held by FNBJ. The issue thus becomes whether the jury could have reasonably found that the letter expired through the fault of the bank.
The pledgee is not at fault if the pledged item loses value as a result of market trends or conditions over which he has no control. Naquin v. American Bank of Luling, 347 So.2d 332 (La.App. 4th Cir.1977). Nor is he required to take action to preserve the value of the pledge which is contrary to his own interests and legal rights when he has no other obligation to do so. Whitney National Bank v. Jeffers, 573 So.2d 1262 (La.App. 4th Cir. 1991). We cannot say, however, on the record compiled in this case, that it would be unreasonable to conclude that FNBJ did have a fiduciary obligation to take affirmative steps to preserve the value of this pledge.
FNBJ was fully cognizant, virtually from its inception, of Trans-Global's plan to import couplings from China, having helped to put the complicated deal in place. FNBJ loan officer Spratt's testimony reflected an intimate knowledge of and involvement in the development of the transaction, from his preliminary discussions with Wyatt and Naquin to his review of the terms of Trans-Global's contracts with CCSI and Pel-Star. Further, Wyatt testified that after going over the details of the CCSI contract, Spratt assured him that if Trans-Global could sell the couplings, and get a revolving letter from the purchaser as security, FNBJ would finance the transaction. Wyatt again consulted with Spratt after signing the contract with Pel-Star, and testified that Spratt virtually dictated the terms of the letter of credit that Pel-Star acquired from FNBL, since it was intended from the beginning that FNBJ would be the financier and holder of the letter. FNBJ was therefore obviously aware of the terms of both the CCSI and Pel-Star contracts, and knew what consequences failure to issue timely letters of credit would have on the delivery schedules under those contracts.
There was also testimony, as discussed above, that Wyatt and Naquin continued to rely on Spratt's assurances that the bank *454 would finance all ten shipments until they were finally told otherwise in late May 1982. We cannot say, therefore, that under the circumstances of this case, the jury would have been manifestly erroneous to find that FNBJ had a fiduciary duty both to ascertain the expiration date of the FNBL letter of credit which it held in pledge, and to take action to prevent its expiration. Because we determine that the jury would not have been clearly wrong in finding a breach of a contractual or a fiduciary duty, we conclude that there is no merit in the defendant's second assignment of error.

Defendant's Third Assignment of Error
In its third assignment of error, FNBJ contends that any breach which it allegedly committed was not a proximate or foreseeable cause of Trans-Global's damages. It argues that protracted litigation was required to establish that the FNBL letter of credit did indeed expire on July 24, 1982, and that there was no way for the bank to foresee the resulting loss to Trans-Global.
Nor, FNBJ maintains, were its actions the cause-in-fact of Trans-Global's damages. It asserts that the FNBL letter of credit was defective in that it was technically not a revolving letter of credit, as guaranteed in Pel-Star's contract with Trans-Global, and because, by its terms, it was subject to the discretion of the Lafayette bank. FNBJ submits that although letters of credit are, as a general rule, independent contracts from the underlying obligations, the FNBL letter of credit was not typical in that it allowed the bank, and thus the bank's customer, Pel-Star, to decide whether the terms of the underlying contract had been met in order to honor a draft upon the letter of credit.
FNBJ also refers to testimony by Bill Oury, president of FNBL, that he would not have permitted any draft on the letter of credit without the approval of Pel-Star's president, David Fitzgerald. Without that approval, which Fitzgerald testified he would not have given, Oury stated that the letter of credit would have expired for the remaining shipments. FNBJ additionally cites the fact that Pel-Star, having cancelled its agreement with Trans-Global after delivery of the first shipment, obtained injunctive relief to prevent FNBL from honoring the draft upon the second shipment. Therefore, FNBJ notes, the Lafayette bank would have been unable to honor the draft even if it had been timely presented.
The bank further argues that under the shipment and delivery schedules established in Trans-Global's contracts with CCSI and Pel-Star, the letter of credit would have expired regardless of any action that it did or did not take. It notes that Trans-Global barely met the deadline to draw upon the FNBL letter of credit for the first shipment, which was done simply on documents. The bank claims that Trans-Global could not possibly have met the deadlines for the second through tenth shipments, which required delivery, customs clearance, and acceptable test results, by the 24th of each month, in order to maintain the letter of credit.
FNBJ also contends that there was an amendment to the Trans-GlobalPel-Star contract which specified that shipments three through ten (not just six through ten) were to be of threaded couplings. It notes that Trans-Global concedes that in order for the threaded couplings to have the required API monogram, CCSI would have to have API certification, and that such certification was not obtained until May of 1983. FNBJ concludes that it would thus have been impossible for Trans-Global to draft timely upon any of those shipments.
In addition to claiming that its actions were not the cause of Trans-Global's damages, FNBJ contends that the award of lost profits in this case was entirely speculative. The $1,079,672 jury award was based on the testimony of William Legier, Trans-Global's expert in financial planning and certified public accounting. FNBJ argues that in order for Legier's calculations to be correct, Trans-Global would have had to prove that every draft on the FNBL letter of credit would have been timely made, with proper documentation and Pel-Star's approval, and that the Lafayette bank *455 would have agreed to pay them. FNBJ strenuously argues that Trans-Global failed to prove that fulfillment of these conditions would have been possible, much less probable.
The bank notes that the trial court agreed with it that the damages awarded by the jury were entirely too speculative, and, as a matter of law, had to be set aside. FNBJ contends, however, that there is no more basis in this case for an award of $500,000 than for an award of $1,079,642.
Finally, FNBJ contends that Trans-Global failed to make any attempt to mitigate its damages. It argues that even when Wyatt and Naquin knew that the bank was not going to issue a revolving letter of credit as required in the CCSI contract, and that the issuance of subsequent letters would be conditioned on performance, they did not seek alternative financing.
We first address whether the court of appeal was correct in reversing the district court's judgment NOV which reduced the damage award to $500,000, and in reinstating the jury award of $1,079,642. Before rendering a judgment NOV, the trial court was required to evaluate the foregoing evidence in the light most favorable to the plaintiff, in order to determine whether the verdict was one which a reasonable jury could have reached. Campbell v. Mouton, 373 So.2d 237 (La.App. 3d Cir.1979). A judgment NOV cannot be granted merely when there is a preponderance of evidence for the mover, but only where "[t]he facts and inferences from the evidence strongly and overwhelmingly point to a conclusion" different than that reached by the jury. Scott v. Hospital Serv. Dist. No. 1, 496 So.2d 270 (La.1986) (quoting Blum v. New Orleans Pub. Serv., Inc., 469 So.2d 1117 (La.App. 4th Cir.1985)). We conclude that the trial judge correctly applied the standard in this case.
As FNBJ argues, the jury award as calculated by Legier depended on the fulfillment of all of the conditions in Trans-Global's contracts with both CCSI and Pel-Star. FNBJ presented persuasive evidence that this eventuality was unlikely to occur. Such factors as the tight delivery schedule specified in the contracts, Pel-Star's attempt to cancel its contract with Trans-Global, and CCSI's inability to acquire API certification (for the threaded couplings) within the necessary time period strongly suggest that the transaction would not have progressed smoothly through all ten shipments, even had FNBJ timely issued its own second and subsequent letters of credit. In sum, we find that there was strong support in the record for the trial court's judgment NOV, and that therefore the court was correct in reducing the damages award.
We next address FNBJ's contention that the reduced amount awarded by the trial court was itself excessive and impermissibly speculative. Because that court did not explain the reasoning behind its award of $500,000, we are relegated to determining whether the record supports a conclusion that that amount lies within the wide range of discretion accorded the trier of fact. We find that although the award is at the high end of that range, it is one which reasonable people might have rendered.
First, despite FNBJ's argument that the first two shipments of blank couplings did not meet the specifications in either Trans-Global's contract with Pel-Star, or in the FNBL letter of credit, Trans-Global produced at trial the reports of an approved testing firm, A.M.F. Tubiscope, which had inspected samples from both shipments and found them to meet API specifications. Conformity with API specifications was the only requirement regarding the quality of the couplings in either the Trans-Global Pel-Star contract or the FNBL letter of credit. Furthermore, when FNBJ attempted to make its second draft on the FNBL letter of credit, its own officer, Don Lathrop, stated under oath that "all necessary and required documentation is attached to the draft."
Moreover, even if, as FNBJ claims, Trans-Global had agreed to provide additional documents of inspection to Pel-Star, the FNBL letter of credit stood as a separate contract. If its terms were met, the bank was obligated to honor the holder's draft, regardless of whether the underlying *456 contract terms were fulfilled, the customer for whom it had issued the letter was insolvent, or the bank was facing litigation with its own customer. See Cromwell v. Commerce & Energy Bank of Lafayette, 464 So.2d 721 (La.1985); Schweibish v. Pontchartrain State Bank, 389 So.2d 731 (La. App. 4th Cir.1980); LSA-R.S. 10:5-114. Therefore, despite Pel-Star's cancellation of its contract with Trans-Global, its resort to litigation to prevent FNBL from honoring Trans-Global's drafts, and its subsequent bankruptcy, FNBL was legally obligated to pay the drafts if they were presented in a timely manner and with the requisite accompanying documentation.
Trans-Global categorically denies FNBJ's claim that the Trans-GlobalPel-Star contract had been amended to state that only the first two, rather than the first five shipments would consist of blank couplings. It maintains that the proposed amendment contemplated that Pel-Star would have its bank strike any time requirement from its letter of credit, a change which Pel-Star was evidently unable to accomplish. Therefore the amendment was never adopted.
Nor does it seem unreasonable to assume that had FNBJ issued its second letter of credit in May, as contemplated, the second shipment of couplings could and would have arrived in the United States and been tested in time for FNBJ to present a draft to FNBL by July 24th, and that had FNBJ continued to issue the letters on a monthly basis, the subsequent deadlines could and would have been met. For example, the second shipment was evidently placed on board on July 31 (trial testimony indicated that the actual loading date may have been later), and arrived in Houston on September 17th. If that consignment had been shipped in early June, the couplings could have arrived and been tested by July 24th.
Perhaps the most difficult damages to quantify are those associated with the shipments six through ten of threaded couplings. FNBJ introduced copies of telexes between CCSI and Trans-Global which indicated that as late as September 1982, there were still serious obstacles to CCSI's acquiring the certification necessary to manufacture threaded couplings with the requisite API stamp. Further, CCSI did not actually obtain API certification until May of 1983. However, there was testimony that Trans-Global, following FNBL's refusal to honor a second draft on its letter of credit, had attempted to stall the Chinese and the accreditation process until it found another buyer for the couplings. Wyatt testified that "We could have expedited the process to get them approved if we'd wanted to."
As previously related, the trial judge found that the jury award, which granted the plaintiff 100% of the profits that it would have made if the remaining nine monthly shipments had been successfully completed as planned, was impermissibly speculative and conjectural.[8] He thereupon reduced the award by slightly more than 50%, to $500,000. We realize that the reduced award also reflects some speculation regarding how many shipments could and would have been successfully completed if FNBJ had posted its second and subsequent letters of credit in a timely manner. As discussed above, however, there is support in the record for the court's determination. When damages are insusceptible of precise measurement, much discretion is left to the court for their reasonable assessment. La.C.C. art. 1999; see also Coco v. Winston Ind., 341 So.2d 332, 335 (La.1977) ("Realistically, in quantum issues, as in other issues, there must necessarily be a degree of uncertainty in predicting the ultimate result in a given case."); Brantley v. Tremont & Gulf Ry. Co., 226 La. 176, 75 So.2d 236 (1954) (when plaintiff has sustained damage as the result of the defendant's fault, trial court must fix quantum as best it can, and in this connection, trial judge is vested with much discretion). Any recalculation by this court *457 of the amount owed to the plaintiff in this case would itself be based on speculation, and would constitute a substitution of our judgment for that of the trial judge. For the foregoing reasons, therefore, we reinstate the trial court award of $500,000.

Plaintiff's Assignment of Error
The final issue remaining is Trans-Global's contention that the trial court should have awarded judicial interest from the date on which it was damaged as a result of FNBJ's breach of a fiduciary or contractual duty. Trans-Global calculates that date to have been June 30, 1983, the date that its contracts with CCSI and Pel-Star were to have been completed. Alternatively, it argues that at the latest, judicial interest should run from the date of judicial demand, December 10, 1985.
Although the trial court did not assign reasons for its award of interest from the date of judgment, the court of appeal affirmed its decision on the basis that the judge had "obviously concluded that damages in this case were not ascertainable" until that date. While we agree that the damages in this case were not ascertainable until reduced to judgment, we nevertheless find that interest should run from the date of judicial demand.[9] That finding is consistent with longstanding Louisiana jurisprudence.
In Alexander v. Burroughs Corp., 359 So.2d 607 (La.1978), this court noted that decisions on interest recovered as the result of lawsuits are both numerous and inconsistent. The court went on to state:
There is, however, a thread of consistency among the cases. Article 554 of the Louisiana Code of Practice of 1825 provided that interest should not run on accounts or unliquidated claims, but was repealed by La. Acts No. 53 § 1. This Court once commented,
"We have uniformly held that, since the passage of that act all sums due on contracts bear interest from judicial demand, even where none has been stipulated, and the demand is unliquidated." Sullivan v. Williams, 2 La. Ann. 876, 878 (1847).
See also Petrie v. Wofford, 3 La.Ann. 562 (1848); Comment, The Running of Legal Interest in Louisiana, 6 Tul.L.Rev. 614 (1932).
The defendant urges us to follow the practice of those jurisdictions which allow prejudgment interest only when the amount in controversy is either liquidated or is readily ascertainable by simple computation. That practice is reflective of the common law view of interest as punitive in nature. According to that view, when damages are reasonably ascertainable, the defendant can determine what his liability might be, and stop the accrual of interest by paying the claim; when the damages are uncertain, however, the defendant cannot determine the extent of his liability prior to trial, and it would be unjust to penalize him for failure to pay the damages before judgment. See C. McCormick, Damages, §§ 50 & 55 (1935); Annot., 60 A.L.R.3d 487 (1974); Comment, Prejudgment Interest: Survey and Suggestion, 77 Nw.U.L.Rev. 192 (1982).
Under civil law doctrine, however, damages are viewed as reparation for the loss suffered by the creditor, and not as a penalty imposed on the debtor. See 2 Planiol, Treatise on the Civil Law § 247, at 149 & 150 n. 15 (La. State Law Inst. trans.1959) (distinguishing foreign systems which "wrongly attribute to damages a penalty function in addition to their function of satisfaction"); see also McCormick, supra, at 209 (Roman law recognized the justice of compensating creditor by way of damages for loss of use of his money); 7 S. Litvinoff, Louisiana Civil Law Treatise, Obligations § 180; Comment, The Running of Legal Interest in Louisiana, supra, at 626.
Further, this view is in accord with the modern understanding of interest: "compensation allowed by law or fixed by the *458 parties for the use or detention of money, or allowed by law as additional damages for loss of use of the money due as damages, during the lapse of time since the accrual of the claim." C. McCormick, supra, at § 50 (emphasis added). It is recognized that money has a "use" value, and that prejudgment interest, which represents the use which the defendant has had of the money found to be owed to the plaintiff, is a necessary component of the plaintiff's full compensation. The Pennsylvania Supreme Court has noted that "Although the award for delay of time may be `in the nature of interest,' in reality, it is merely an extension of the compensatory damages necessary to make a plaintiff whole." Laudenberger v. Port Auth. of Allegheny Cty., 496 Pa. 52, 436 A.2d 147 (1981); see also State v. Phillips, 470 P.2d 266 (Ala.1970); Argonaut Ins. Co. v. May Plumbing Co., 474 So.2d 212 (Fla.1985); Emery v. Tilo Roofing Co., 89 N.H. 165, 195 A. 409 (1937); Cavnar v. Quality Control Parking, Inc., 696 S.W.2d 549 (Tex. 1985); C. McCormick, supra, at § 50; T. Sedgwick, A Treatise on the Measure of Damages § 300 (9th rev. ed. 1920); Annot., 60 A.L.R.3d 487, at § 2; Note, Developments in the Law, 61 Harv.L.Rev. 113, 136-38 (1947); Comment, Recovery of Prejudgment Interest On an Unliquidated State Claim Arising Within the Sixth Circuit, 46 U.Cin.L.Rev. 151 (1977) [hereinafter cited as Cincinnati Comment].
Courts and commentators have also noted that allowing the defendant to keep the interest that could be earned on the amount eventually awarded would result in his unjust enrichment. See, e.g., South Cent. Livestock Dealers v. Security State Bank, 614 F.2d 1056 (5th Cir. 1980) (applying Texas law); Davis Cattle Co. v. Great Western Sugar Co., 393 F.Supp. 1165 (D.Colo.1975), aff'd, 544 F.2d 436 (10th Cir. 1976), cert. denied, 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977). The defendant is not penalized by prejudgment interest because he is only returning the benefits he has received from use of the plaintiff's money. Miller v. Robertson, 266 U.S. 243, 45 S.Ct. 73, 69 L.Ed. 265 (1924). This restitution is particularly appropriate in regard to financial institutions since they derive much of their income from investments. Cincinnati Note, supra, at 155.
The defendant argues that awarding prejudgment interest on damages which are unliquidated and unascertainable before trial will encourage plaintiffs, the moving parties in the litigation, to delay the lawsuit's progress, and will chill defendants' rights to raise meritorious defenses. When such interest is unavailable, however, the plaintiff is clearly the party prejudiced by the lengthy litigation process. One court has noted that "[t]he only thing which reduces a plaintiff's loss is an early settlement of his damages. [Prejudgment interest] therefore must be viewed as comporting with the constitutional requirements of both equal protection and substantive due process." Laudenberger v. Port Auth. of Allegheny Cty., 496 Pa. 52, 436 A.2d 147, 157 (1981). Further, prejudgment interest is assessed only if the case is not settled and a court is required to determine liability and to assess the amount of damages owed. The fact that the claim is not liquidated does not mean that it is not capable of evaluation for settlement purposes.[10] Indeed, removing the economic incentive for defendants to delay settlements is an incidental effect of awarding prejudgment interest. T. Londrigan, Prejudgment Interest: The Case For, 72 Ill.B.J. 63 (1983); see also W.R. Vezina, Recoverability of Pre-Judgment Interest: Argonaut v. May Plumbing, 60 Fla.B.J. 39 (Mar.1986). Finally, once suit has been filed, the trial judge is able to oversee and control the pace of the litigation, with the authority and means to prevent unreasonable delays.
*459 For the above reasons, we conclude that interest is due, not from the date of judgment, but from the date of judicial demand.
We must also, however, answer the plaintiff's contention that in this case interest should be awarded from the date of the defendant's breach, some two-and-a-half years before suit was filed. It cites the cases of delaVergne v. delaVergne, 514 So.2d 186 (La.App. 4th Cir.1987) and Alexander v. Burroughs Corp., 359 So.2d 607 (La.1978) as precedent for that contention. Whatever the merits of those decisions, however, they are easily distinguished from the case before us. In delaVergne, a succession representative acquired real property from succession heirs without disclosing that there was an outstanding offer for the property at a significantly higher price. The court awarded the heir the difference between the two purchase prices from the date that the heir sold the property to the representative at the reduced price. Burroughs was a redhibition case, involving a defective accounting computer. This court found that because the damages were ascertainable on the date the plaintiff's attorney placed the defendant in default by formally demanding cancellation of the sale, interest would run from that date rather than the later date when suit was filed. In both cases, the amounts owed were both due and easily ascertainable on the dates from which interest was awarded. See also Benglis Sash & Door Co. v. Leonards, 387 So.2d 1171 (La.1980) (interest held to run from date of delivery of goods, rather than date of judicial demand); Paul M. Davison Petroleum Prods. v. L.T. Brown Contractor, Inc., 364 So.2d 583 (La.1978) (seller was entitled to legal interest from date sworn statement of amount due was filed and recorded, rather than from date of judicial demand); Comment, Running of Legal Interest in Louisiana, supra at 616-26.
In contrast, this case is a highly complicated one, in which three courts have had difficulty in determining whether there was a breach meriting compensation, and what the consequential damages of that breach should be. The variations in the amounts awarded by the jury ($1,079,642), the trial court ($500,000), the court of appeal ($1,079,642), and now this court ($500,000), clearly demonstrate that the damages owed by FNBJ to Trans-Global were not ascertainable at the time when the breach occurred. We therefore conclude that there is no merit in plaintiff's contention. Rather, for the reasons previously expressed, (and irrespective of the ascertainability of the damages as of the date of filing), we will award interest from the date of judicial demand.

DECREE
For all of the foregoing reasons, the judgment of the court of appeal is reversed, and the judgment of the district court is reinstated in part. There will be judgment in favor of Trans-Global Alloy, Ltd. and against First National Bank of Jefferson in the full and true amount of $500,000 with legal interest from judicial demand and for all costs.
JUDGMENT OF THE COURT OF APPEAL REVERSED; JUDGMENT OF THE DISTRICT COURT REINSTATED IN PART; AND JUDGMENT RENDERED.
DENNIS, J., joins in the opinion but does not agree with the treatment of the assignments dealing with Civil Code Article 1846 and lender fiduciary liability.
NOTES
[*] Judge Charles R. Lindsay of the Court of Appeal, Second Circuit, participated in this decision as Associate Justice Ad Hoc in place of Associate Justice Walter F. Marcus, Jr., who was recused.
[1] In contrast to a "conventional" letter of credit, which ceases to exist as soon as the amount of credit specified in the letter is drafted on, a revolving letter of credit provides renewable credit. The stated amount of the revolving letter of credit, though partially diminished by each draft, rises again to the original stated amount after a draft has cleared. This type of letter of credit is used when it is known that there will be periodic drafts under a single transaction, or to allow for a series of transactions under a single letter of credit. Although the amount of credit available fluctuates, there is only one credit in existence. Trans-Global Alloy, Ltd. v. First National Bank of Lafayette, 490 So.2d 769 (La.App. 3d Cir.1986).
[2] Because FNBJ had no international department, it used other banks when an international letter of credit was required. In this case, in accordance with regular banking practice, the letter of credit was issued jointly by FNBJ and its corresponding or "upstream" bank, Allied Bank of Texas.
[3] Although Letter of Credit No. 793 established a specific expiration date for only the first draft, it also stated that it incorporated and was subject to the Uniform Customs and Practice for Documentary Credits, which provides in pertinent part:

If shipment by installments within given periods is stipulated and any installment is not shipped within the period allowed for that installment, the credit ceases to be available for that or any subsequent installments, unless otherwise specified in the credit.
The court of appeal concluded that the letter of credit contained specific time limits for presentation of each draft under the single credit, and that the letter of credit had therefore expired on July 24, 1982, the date by which the second draft was to have been presented.
[4] The instruction consisted of the following statement:

When a creditor, in this case FNJ, takes a pledge, it holds it for security until the debt is paid. If the pledged thing is lost or destroyed because of the fault of the creditor while he holds it, the creditor is liable. The Court of Appeal in Louisiana has held that the letter of credit No. 793 expired and became worthless.
[5] Indeed, FNBJ's argument regarding legal errors in the jury instruction and interrogatory was not even made to the court of appeal. That argument was raised for the first time in a supplemental writ application to this Court.
[6] The issue of FNBJ's fiduciary obligations first arose through its own counsel's direct examination of FNBJ president, Elton Arceneaux. Then on cross-examination, Mr. Arceneaux testified that FNBJ held Letter of Credit No. 793 in trust, as a fiduciary, for Trans-Global. William Ory, vice-president of FNBL at the time of the transactions in question, testified that allowing a letter of credit held as collateral to expire would be contrary to good banking standards. The defendant's banking expert, James Byrne, testified that when a bank holds as collateral the property of a debtor, it legally assumes a fiduciary duty to protect the collateral. Finally, in closing argument, FNBJ's counsel contended that because the bank had a "tickler system" in place which would have alerted it to the letter of credit's expiration date, there was no breach of fiduciary duty on its part, an implicit concession that FNBJ had a fiduciary duty to safeguard the letter and its value.
[7] That statute provides:

A debtor shall not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor.
[8] The plaintiff's expert in financial planning and certified public accounting, William Legier, on whose testimony the jury award was based, calculated its losses as the lost profits on the nine shipments ($947,200) plus the amount lost by Trans-Global as a result of expenses incurred in anticipation and preparation for the unfulfilled contract ($132,458), or a total of $1,079,672.
[9] Legal interest from date of judicial demand has been statutorily mandated since 1916 in cases sounding in damages "ex delicto." See LSA-R.S. 13:4203. That provision is, of course, not applicable here.
[10] One commentator has noted that

Defendant's apparent dilemmawhether to pay the claim and avoid prejudgment interest, or to litigate the claim with the possibility of an interest awardis illusory. If defendant is found liable, he has not suffered the uncertain loss of interest damages. Theoretically, the money controlled by him, and found owing as damages, has produced during the period of litigation the exact amount due as prejudgment interest.
Cincinnati Comment, supra, at 164.