644 So.2d 247 (1994)
RIVERFRONT INVESTORS GROUP, a Partnership In Commendam
v.
Martin A. CHAVEZ and Chavez Properties, a Georgia General Partnership.
No. 94-CA-0353.
Court of Appeal of Louisiana, Fourth Circuit.
October 13, 1994.
Rehearing Denied November 15, 1994.
*248 Marcel Garsaud, Jr., William T. D'Zurilla, Steven W. Copley, Martin E. Landrieu, Gordon, Arata, McCollam & Duplantis, L.L.P., New Orleans, for appellants.
C. Ellis Henican, Jr., Thomas P. Henican, Henican & Brown, New Orleans, for plaintiff-appellant.
Before SCHOTT, C.J., and BYRNES and WALTZER, JJ.
BYRNES, Judge.
By agreement dated February 19, 1990, Chavez Properties (Purchaser), a Georgia General Partnership, agreed to purchase and Riverfront Investors Group (Seller), a partnership in Commendam, agreed to sell certain property for one million seven hundred thousand dollars ($1,700,000). Purchaser decided not to consummate the deal. Seller filed suit seeking specific performance on February 26, 1991. Purchaser attempted unsuccessfully to remove the case to Federal court.
On December 4, 1991, Purchaser moved for partial summary judgment to limit its potential liability to a maximum of $10,000, the amount of earnest money called for in the agreement, but which had never been deposited. This motion was denied.
On July 28, 1992, in an effort to mitigate damages, Seller sold the property to a third party for $1,600,000. Thereupon, Seller amended its claim dropping its claim for specific performance. Instead Seller requested the $100,000 difference between the $1,700,000 called for in the agreement and the $1,600,000 realized in the sale to the third party, with legal interest and a claim for attorneys fees pursuant to the Louisiana unfair Trade Practices Act and Consumer Protection Law.
After a bench trial, the court awarded Seller the $100,000 difference in the sales price, plus interest at the rate of 6% until *249 July 1992 amounting to $204,000, together with interest from July 1992 until paid. The court rejected Seller's Unfair Trade Practices Claim. Both parties have appealed this judgment. We affirm in part and reverse in part.

I. PURCHASER'S LIABILITY CANNOT EXCEED THE $10,000 CALLED FOR AS A DEPOSIT AMOUNT.
Two provisions in the agreement govern the liability of Seller for failing to perform. Paragraph 5 provides:
Purchaser, upon execution of this contract, shall place with Landrieu-Wren Co., Inc., as Escrowee, a check for the sum of Ten Thousand Dollars ($10,000.00) as earnest money to be credited against the purchase price at closing.... If the offer is not accepted or if Seller defaults in the performance of this contract, the Earnest Money shall be promptly returned to Purchaser.
Paragraph 11 provides:
If this offer is accepted and Purchaser refuses to perform, the deposit shall be paid to Seller as liquidated damages and Seller shall have no other further recourse against Purchaser.
Purchaser argues that these provisions limit its exposure for failing to perform to $10,000. We agree. Seller does not contest the fact that this was the intended purpose of these provisions, but argues that the failure of Purchaser to place the check in escrow as called for in the quoted portion of paragraph 5 of the agreement effectively deprives Purchaser of the advantage of being able to limit its exposure. We disagree.
The effect of Purchaser's failure to actually advance the escrow check called for in the agreement is a question of law, as is the effect of the language contained in the agreement. Therefore, the manifest error rule does not apply to this issue.
We find that the term "Earnest Money" was used in this contract to describe a sum of money that would simultaneously serve as a deposit and as liquidated damages in the event Purchaser failed to perform, as opposed to a figure that was meant to serve only as one or the other. From the perspective of Seller, the agreement provides that Seller is to return only the "Earnest Money" and not the "double" in the event 80% of Seller's limited partners do not accept or if Seller defaults. Thus the term "Earnest Money" is not "earnest" in accordance with LSA-C.C. art. 2463 except to the extent that purchaser would forfeit the deposit in the event of its breach and that neither party could demand specific performance.
The contract does not call for the Seller to return the "double" in the event of default as it would be required to do had the parties adopted the provisions of LSA-C.C. art. 2463 governing earnest money. The consequences to Seller for failing to accept the agreement are the same as those to which it would be subjected if it defaulted. LSA-C.C. art. 2463 applied to situations where offer and acceptance already existed. But in the present case acceptance by Seller did not exist when the so called "earnest" was given. Seller was not required to return the "double" in the event it never fully accepted the deal. Since Seller was free to withdraw without penalty from a deal to which it had not yet even agreed, Seller should not benefit from its failure to accept. Therefore the agreement provides that Purchaser's $10,000 deposit (but not the double) must be returned to Purchaser upon failure by Seller to consummate acceptance of the agreement by obtaining 80% approval of its limited partners.
In the same sentence the agreement provides the same result if Seller defaults, i.e., fails to go through with the sale subsequent to full acceptance. If it had been the intention of the parties to employ the term "Earnest Money" in the strict LSA-C.C. art. 2463 sense, the agreement would have treated Seller's failure to perform differently from Seller's failure to acceptit would have required Seller to have returned the "double". By explicitly limiting Seller's penalty for failure to perform to the return of the deposit and not the "double", the agreement unambiguously rejects the provisions of LSA-C.C. art. 2463.
There is no public policy that prevents the parties from contracting in this manner. *250 Concomitantly, it is equally clear that the extent of Purchaser's liability for failure to perform was the $10,000 amount called for as a deposit. If it had been the intention of the parties to incorporate the provisions of LSA-C.C. art. 2463, the agreement would not contain paragraph 11 which is the clause that provides that the $10,000 deposit shall be liquidated damages in the event Purchaser defaults.
This Court's interpretation of paragraphs 5 and 11 of the agreement is consistent not only with the clear and unambiguous language of those provisions, but it is consistent with the structure of the deal. The penalties for the failure of either party to perform are nominal relative to the $1,700,000 purchase price, but are consistent with the tenuous nature of the agreement. Paragraphs 5 and 11 of the agreement represent an expression of intent by the parties that neither of them contemplated either relief or liability in the form of specific performance or damages, depending on whether they were the party demanding or the party resisting.
The only damage Seller could have sustained as a result of Purchaser's failure to advance the escrow check was a delay in obtaining the use of the $10,000. Interest on that sum is the appropriate remedy for damage of that nature, should Seller prove its entitlement thereto. The failure of Purchaser to furnish the required deposit does not confer upon Seller a claim for specific performance or damages never contemplated by the parties. Those are remedies (which Purchaser and Seller waived by contract in this case) for a failure to purchase the property, not for a failure to advance the deposit check.
"Earnest" is a term of art, defined by LSA-C.C. art. 2463. In spite of the potential for ambiguity or confusion, that is always present when using a term of art without scrupulous regard for its precise legal meaning, there is no public policy that prevents the parties to legal documents from using the term with a different meaning, as was done in this case. We find that deviation by the parties from the LSA-C.C. art. 2463 meaning of "earnest" when placed in context created no such confusion or ambiguity.
In the absence of a specific provision in the agreement stipulating that the failure of Purchaser to advance the earnest money check shall entitle Seller to demand specific performance or damages, we find no merit in Seller's position.

II. PURCHASER DID NOT HAVE THE RIGHT TO WITHDRAW FROM THE CONTRACT FOR ANY REASON.
Paragraph 6A of the agreement provides that:
This purchase and sale is subject to the following:
A. Investigation Period: 60 days for the Purchaser to investigate the property's suitability to the Purchaser's contemplated use as a surface parking facility. For the purpose of this contract, the Investigation Period will begin the day after written notification from the Seller, as to the approval of 80% of the limited partners of Riverfront Investors Group, has been given to Purchaser. If during the Investigation Period the Purchaser finds the property unsuitable to the Purchaser's contemplated use, this contract will become null and void and the earnest money shall be promptly returned to the Purchaser. Purchaser agrees to contract with a recognized engineering and testing firm to complete the survey within the sixty (60) day period at Purchaser's expense. The Seller will receive copies of and rights to use the report and to rely upon it as if the Seller had contracted for it. (Emphasis added).
Purchaser argues that the language emphasized above allowed it to withdraw from the sale for any reason whatsoever. One of the reasons Purchaser gave for withdrawing from the sale was its belief that the land was not going to be a profitable investment. We do not agree. We adopt the trial court's analysis of this portion of the agreement as our own:
.... It is not an option.
The condition of suitability refers to suitability as a surface parking facility, and not as to the profitability of the venture.

*251 III. SELLER ACCEPTED THE AGREEMENT BEFORE PURCHASER ATTEMPTED TO WITHDRAW.
Implicit in the judgment of the trial court is the finding that Seller accepted the agreement prior to the time that Purchaser attempted to withdraw. The record supports that implicit finding.
Purchaser argues that it had the unilateral right to withdraw from the agreement at any time prior to the acceptance of the agreement by Seller as indicated by the approval of 80% of Seller's limited partners, and that it in fact did so.
Paragraph 6C of the agreement provides:
Approval of 80% of limited partners of Riverfront Investors Group. Such approval will occur on or before March 16, 1990 at which time written notification of such approval will be sent to Purchaser within 24 hours by registered mail.
Paragraph 6C allowed Seller until March 16, 1990 to obtain the approval of 80% of its limited partners which would constitute acceptance of the deal, during which time Purchaser had no unilateral right to withdraw. LSA-C.C. art. 1928. That Seller accepted prior to that time is undisputed. The parties formally stipulated:
On March 15, 1990, plaintiff sent Chavez Properties, a Georgia General Partnership, a registered letter notifying it that more than 80% of plaintiff's limited partners approved the Real Estate Purchased Contract.
Purchaser's argument raised for the first time in its reply brief that Seller's acceptance was governed by paragraph 14 of the agreement which states:
This offer shall remain open for acceptance until 5:00 p.m. Eastern Standard time on Friday, February 23, 1990.
"Acceptance" as used in this paragraph is not the same as "acceptance" as used elsewhere in the agreement where reference is made to obtaining approval of 80% of Seller's limited partners. Paragraph 14 refers to the fact that the agreement was not executed simultaneously by the three signatories. The terms "execution" or "signing" would have been more descriptive than "acceptance", but the meaning of "acceptance" is nonetheless clear and unambiguous when paragraph 14 is read in the context of the entire agreement as it must be. The agreement is dated February 19, 1990, but Purchaser did not sign until February 21; Seller's general partner did not sign until February 22; and the real estate broker did not sign until February 23. Paragraph 14 anticipates that the agreement would not be signed by all parties simultaneously and places a time limit only on the signing of the contract. This time limit on signing has no bearing on the acceptance of Purchaser's offer by Seller which required the approval of 80% of Seller's limited partners as stipulated in paragraph 6C. Where paragraphs 5 and 11 use the term "accepted" they clearly and unambiguously refer to the approval of 80% of Seller's limited partners as set forth in paragraph 6C and not the acceptance (read "signing") referred to in paragraph 14. That 80% approval of Seller's limited partners is the crux of the agreement is further demonstrated by references to that event in numerous other paragraphs of the agreement. It is clear that the parties did not contemplate that the approval of Seller's limited partners would be obtained by February 23, and Purchaser does not contend otherwise.

IV. DIFFICULTY IN OBTAINING APPROPRIATE PERMITS DOES NOT EXCUSE PURCHASER'S FAILURE TO APPLY FOR THEM.
Paragraph 6B of the agreement provides:
Purchase is subject to Purchaser acquiring all appropriate permits and licenses to operate a surface parking facility on the entire premises. Purchaser agrees to apply within ten (10) days of approval of 80% of limited partners of Riverfront Investors Group. All expenses to be Purchaser's. Seller agrees for Purchaser to use Seller's name on the application after Seller's review and approval (not unreasonably withheld). (Emphasis added)
Purchaser contends that its withdrawal from the agreement was prompted by zoning as well as financial reasons. Apparently a zoning change or a conditional use *252 permit was required before Purchaser would be permitted to use the property for a surface level parking lot as intended. Purchaser contends that the city councilman in whose district the property is located was opposed to allowing the property to be used as a parking lot. A representative of the Historic District Landmarks Commission and the Director of the City Planning Commission were also allegedly opposed. Purchaser contends that the chances of obtaining the necessary zoning concessions were remote in the face of such opposition.
The law does not require Purchaser to do a vain thing. However an unlikely thing is not synonymous with a vain thing. Initial opposition is sometimes overcome. We find that the agreement required that Purchaser at least make a good faith effort to apply for the necessary zoning concessions. In the absence of any such effort on Purchaser's part, Purchaser may not use zoning problems as an excuse for its failure to go through with the purchase.

V. INTEREST RUNS ON SELLER'S CLAIM FROM THE DATE PURCHASER BREACHED THE AGREEMENT.
Seller's claim to the $10,000 deposit became due and ascertainable on the day that Purchaser breached the agreement. Alexander v. Burroughs Corp., 359 So.2d 607, 613-14 (La.1978). The agreement declared this sum to be liquidated damages. There can be no doubt as to liability or quantum. Trans-Global Alloy Ltd. v. First Nat. Bank of Jefferson Parish, 583 So.2d 443, 459 (La. 1991); Whitney Nat. Bank of New Orleans v. Poydras Center Associates, 557 So.2d 422, 427 (La.App. 4 Cir.1990).
On March 23, 1990, Purchaser wrote to Seller denying the existence of a contract and stating that the property was unsuitable to Purchaser's use. We find that this is the date on which Purchaser actively breached the agreement.

VI. LANDRIEU-WREN REAL ESTATE BROKERS WERE PURCHASER'S AUTHORIZED REPRESENTATIVES.
Purchaser argues that Landrieu-Wren real estate brokers were not its authorized representatives. Therefore Purchaser should not be bound by their actions. On January 10, 1990, Martin A. Chavez sent a letter referencing the purchase of the property which stated:
This letter is to acknowledge that Landrieu-Wren Co., Inc. is representing our firm in the acquisition of the property located at Convention Center Boulevard.
Purchaser contends that when it stated that "... Landrieu-Wren Co., Inc. is representing our firm ..." it meant only that it intended for Landrieu-Wren to receive a real estate commission, not that it actually represented the Purchaser. We are not persuaded by Purchaser's argument. We find that the plain language of the letter speaks for itself. This plain language is borne out by the actions of all parties during the course of these dealings. It is only after the fact that Purchaser has attempted to repudiate this representation.

VII. SELLER IS NOT ENTITLED TO A JUDGMENT AGAINST MARTIN CHAVEZ INDIVIDUALLY.
Almost as an afterthought, Seller argued that it is also entitled to judgment against Martin Chavez individually. Martin Chavez did not sign the agreement in his individual capacity and Seller failed to prove that the entity on whose behalf Mr. Chavez signed did not exist. We find no merit in Seller's argument.

VIII. DECREE
For the foregoing reasons, the judgment of the trial court is affirmed on the question of liability, but amended on the question of quantum to reduce the amount awarded to Riverfront Investors Group to $10,000 with legal interest from the date Chavez Properties breached the agreement, on March 23, 1990.
AFFIRMED AS AMENDED.