797 So.2d 160 (2001)
David FOWLER, et al.
v.
Juan BOSSANO, M.D., et al.
No. 01-0357.
Court of Appeal of Louisiana, Third Circuit.
October 3, 2001.
*162 Michael Keith Prudhomme, Woodley, Williams, Boudreau, Norman, Brown & Doyle, L.L.C., Lake Charles, LA, Counsel for La. Patient's Compensation's Fund.
Jimmy Roy Faircloth, Jr., Faircloth & Davidson, L.L.C., Alexandria, LA, Counsel for David Fowler and Jennifer Fowler.
Court composed of NED E. DOUCET, JR., Chief Judge, OSWALD A. DECUIR and MARC T. AMY, Judges.
AMY, Judge.
The plaintiffs filed suit following the death of their newborn son, naming the neonatologist and the hospital as defendants. While the neonatologist was dismissed from the suit, the hospital tendered the $100,000 limit under the Medical Malpractice Act. The Louisiana Patient's Compensation Fund proceeded to trial. The jury found in favor of the plaintiffs. The judgment rendered reflected that the $500,000 statutory maximum was awarded along with a separate award for medical expenses. The defendant appeals that judgment. The plaintiffs have answered the appeal, seeking an increase in the medical expenses awarded and imposition of penalties for frivolous appeal. For the following reasons, we increase the amount of medical expenses awarded and affirm the amended judgment.

Factual and Procedural Background
Jennifer Fowler gave birth to twins on March 26, 1996, in DeRidder, Louisiana. The twins, Laci Elizabeth and Nelson Ryan, were born at twenty-six and a half weeks of gestation, thirteen and a half weeks early. Due to their premature birth, they were transferred to Lake Charles Memorial Hospital (LCMH) and were cared for by Dr. Juan Bossano, a neonatologist. According to Dr. Bossano, in the following weeks, the infants experienced complications and problems associated with premature birth, including respiratory and feeding difficulties. The twins' treatment included the necessity of blood transfusions. Dr. Bossano stated that the twins proceeded through these difficulties and began to make progress, but that Ryan took a turn for the worse. Those testifying noted that Ryan's condition began to deteriorate on May 7th. According to Dr. Bossano, Ryan's condition generally continued to deteriorate until he died on May 25th.
Dr. Bossano stated that he was initially unsure of the cause of death, but that during the final week of Ryan's life, it became apparent to him that it was not due to a bacterial infection, a possibility for which he had treated Ryan. He concluded that the most likely cause of death was due to viral infection. At his urging, an autopsy was performed, with the pathologist finding the presence of cytomegalovirus inclusion (CMV) disease. Dr. Bossano stated that he learned that the lab at *163 LCMH did not, at that time, screen for the presence of the virus in the blood used for transfusions. The question of whether the presence of CMV disease was the cause of Ryan's death became the issue in the suit that followed.
Following his death, Ryan's parents, Jennifer and David Fowler, instituted proceedings under the Medical Malpractice Act, convening a medical review panel against Dr. Bossano and LCMH. The panel determined that the evidence presented did not support a finding that Dr. Bossano breached the standard of care. As for LCMH, however, the panel found that the evidence supported a finding that it failed to comply with the appropriate standard of care with regard to the testing of blood. The following written reasons for the opinion were rendered:
The child most likely expired from an overwhelming CMV viral infection resulting from blood product usage.
The Hospital's blood bank formal policy for Selecting Components for Neonatal Transfusion provided in Section III, D that "Special requests for blood products such as irradiated or CMV negative products are provided upon request, but are not routinely used."
However, the American Association of Blood Banks 16th Edition of Standards for Blood Banks and Transfusion Services provided in Section 18.500, that "Where transfusion-associated CMV disease is a problem, cellular components should be selected or processed to reduce that risk to infant recipients weighing less than 1200 grams at birth, when either the infant or the mother is CMV antibody-negative or that information is unknown."
Consequently, the Hospital's policy did not provide for compliance with the applicable AABB Policy at that time.
Due to the fact that the Hospital policy deviated from AABB standard, the Hospital had the obligation to properly inform the medical staff and insure that all such infants could be effected [sic] could be readily identified.
Dr. Bossano should have been able to make a correct medical assumption that all high risk infants receiving blood products in the N.I.C.U. would receive CMV negative blood products.
Mr. and Mrs. Fowler filed suit in April 1998, naming both Dr. Bossano and LCMH as defendants. They sought damages associated with a survival action and those for wrongful death.[1] Dr. Bossano was eventually dismissed from the suit. However, the plaintiffs and LCMH reached a settlement for $100,000, the limit of LCMH's statutory responsibility under La.R.S. 40:1299.42.[2] The plaintiffs proceeded against the Louisiana Patient's Compensation Fund (PCF).
After a trial, the jury found that the plaintiffs proved that LCMH caused damages in excess of $100,000. The jury awarded $500,000 each to Mr. and Mrs. Fowler for Ryan's death. As far as the survival action, $314,000 was awarded for *164 Ryan's pain and suffering, $25,000 for medical expenses, and $2,000 for funeral expenses. Due to the Medical Malpractice Act, the judgment rendered by the trial court awarded the $500,000 statutory limit, subject to the $100,000 previously tendered by LCMH. The medical expenses awarded by the jury was also included in the judgment.
The PCF appealed the judgment, assigning the following errors:
1. The trial court erred in failing to exclude the testimony of Dr. Volney Eugene Pierce as cumulative and prejudicial to the defense.
2. The trial court erred in refusing to admit the deposition of Dr. Gray, who was unavailable for trial.
3. The jury erred in finding causation of damages in excess of $100,000.00.
4. The award of future medical expenses was erroneous.
5. Alternatively, the amount of damages awarded was excessive.
The plaintiffs answered the appeal seeking damages for frivolous appeal and seeking an increase in the medical expenses awarded.

Discussion

Expert Witness Testimony
In its first assignment of error, the PCF contends the trial court erred in permitting two pathologists of the plaintiffs' choosing to testify. It contends that either Dr. Volney Eugene Pierce or Dr. Chris Sperry should have been precluded from testifying since, although relevant, the relevance of the testimony of a second pathologist is outweighed by substantial prejudice. Thus, the PCF contends, the balancing test of La.Code Evid. art. 403 prohibits the introduction of the testimony.
La.Code Evid. art. 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Article 403 indicates, however:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
In determining whether an expert's testimony is admissible, a trial court is afforded great discretion. Frederick v. Woman's Hosp. of Acadiana, 626 So.2d 467 (La.App. 3 Cir.1993), writ denied, 93-2991 (La.2/4/94), 633 So.2d 169.
The PCF concedes that the testimony of the two pathologists was relevant to the issues before the court. However, they contend that application of Article 403 prohibits the introduction of the experts as they both testified to essentially the same facts, i.e., the cause of Ryan's death. Indeed both pathologists testified that the cause of death was CMV infection. However, our review of the expert testimony reveals no abuse of the trial court's "great" discretion in permitting the two pathologists to testify. While both testified following review of the medical records, physician depositions, and medical review panel information, and the report of the autopsy performed after Ryan's death, the two offered testimony from their respective areas of expertise. Dr. Pierce testified from the perspective of an expert in the field of anatomic and clinical pathology, while Dr. Sperry, the Chief Medical Examiner for the Georgia Bureau of Investigations, testified from the perspective *165 of an expert in the field of forensic pathology.[3]
However, even if viewed as cumulative, we do not find any abuse of the trial court's discretion in determining that two experts in similar fields could provide testimony. This type of cumulative testimony, if indeed it was found to be cumulative, may or may not have been subject to exclusion depending on whether the trial court found it failed the balancing test of La.Code Evid. art. 403. Here, the trial court found no such undue prejudice, delay or confusion of issues. Review of the evidence does not indicate that any such determination was an abuse of discretion.

Admissibility of Deposition
Next, the defendant asserts that the trial court erred in excluding admission of the deposition of Dr. Michael Gray, the pathologist who performed the autopsy. At trial, the PCF asserted that Dr. Gray, who had apparently moved from the state at the time of trial, was unavailable to testify. Since the PCF had done nothing to procure his absence, it asserted that the deposition should have been permitted.
La.Code Civ.P. art. 1450(A) provides, in part:
(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:
(a) That the witness is unavailable.
(b) That the witness resides at a distance greater than one hundred miles from the place of trial or hearing or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition; or
(c) Upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.
Our review of the pretrial hearing reveals several problems with the PCF's position on this point.[4] While the deposition *166 may not have been permitted, there is no indication that there was a formal objection by the PCF to this determination nor was there evidence of the witness' unavailability to testify; no evidence that he had moved from the state. Next, the deposition offered by the PCF was not entered as a proffer into the record. Rather, the PCF's request to enter the deposition taken for purposes of discovery by the plaintiffs was made on the morning of trial and the trial court afforded the PCF the opportunity to take a trial deposition during the course of the trial. There is no indication that the PCF availed itself of this opportunity. For these reasons, this assignment is without merit.

Damages in Excess of $100,000
The PCF also contends that the jury erred in concluding that CMV was established as the sole cause of Ryan's death. It points to testimony presented by its expert pathologist, Dr. Edwina Popeck, who opined that, while CMV was present, the cause of Ryan's death was bacterial in nature. In support of this conclusion, Dr. Popeck testified that two tracheal aspirates taken while Ryan was in the hospital indicated the presence of bacteria. This bacterial infection, she explained, was the cause of Ryan's death.
As previously stated, LCMH tendered the $100,000 statutory limit prior to trial. According to La.R.S. 40:1299.44(C)(5), this tender acts as an admission of liability as follows:
In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars, or where the self-insured health care provider has paid one hundred thousand dollars.
In Graham v. Willis-Knighton Med. Ctr., 97-0188, p. 15 (La.9/9/97), 699 So.2d 365, 372, the Louisiana Supreme Court explained that the payment of $100,000 in settlement of the claim "establishes proof of liability for the malpractice and for damages of at least $100,000 resulting from the malpractice...." However, in continuing the suit against the PCF, the plaintiff retains the burden of "proving that the admitted malpractice caused damages in excess of $100,000." Id.
As stated above, the PCF presented the testimony of Dr. Popeck, a pathologist, who agreed that CMV was present, but who opined that a bacterial infection was more likely the cause of Ryan's death. The PCF contends that evidence of this position precluded the jury's determination that CMV was the sole cause of Ryan's death. In support of their case, the plaintiffs presented the Medical Review Panel Opinion which, as excerpted above, indicates that LCMH breached the applicable standard of care in failing to *167 test the blood used for this transfusion for CMV and that "[t]he child most likely expired from an overwhelming CMV viral infection resulting from blood product usage." Additionally, the plaintiffs presented the testimonies of two neonatologists who were members of the Medical Review Panel and who both reasoned that CMV was the most likely cause of Ryan's death. Both of the panel members were questioned regarding Dr. Popeck's conclusion regarding the possibility of a bacterial infection as the cause of death and both continued to conclude that CMV was more likely the cause of death. Additionally, Dr. Pierce, a specialist in anatomic and clinical pathology, and Dr. Sperry, a forensic pathologist, opined that the likely cause of death was due to CMV.
As fact finders, it was the jury's role to consider the evidence and the differing expert opinions, make the necessary credibility determinations, and determine which evidence it found more compelling. Here, notwithstanding LCMH's statutory admission of failure to satisfy the applicable standard of care, the evidence presented was sufficient to support the jury's determination that the hospital's breach of the standard of care was the cause of Ryan's death and the cause of damages in excess of $100,000. Accordingly, this assignment is without merit.

Damages Awarded
Finally, the PCF asserts that the damages awarded by the jury were excessive. Primarily, the PCF contests the $500,000 awarded to each of Ryan's parents for his wrongful death. It argues that the award is beyond that which could have been awarded by a reasonable trier of fact. It points to other, reported cases in which lesser amounts were awarded to parents for the death of a newborn child. It also appears that the PCF has contested the $314,000 awarded for the survival action by its statement that many of Ryan's struggles were related to his premature birth and that his twin also endured lengthy hospitalization. Thus, PCF contends, "the amount awarded by the jury on behalf of Nelson Fowler are [sic] clearly excessive."
While the PCF argues that the award made by the jury was excessive, the judgment reflects the limitations required by the Medical Malpractice Act. Thus, the judgment contained a $500,000 award with credit for the $100,000 previously tendered by the hospital. No indication was made in the judgment as to what percentages were attributable to wrongful death or the survival action.
Whether the award made by the jury or that entered by the trial court, we do not conclude that the figures awarded are beyond that which a reasonable trier of fact could award and in need of reduction. See Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The jury was presented with evidence indicating that Ryan suffered for over two weeks from the infection that led to his death. Testimony was heard indicating that Ryan suffered from a series of procedures related to the complications and that he was repeatedly sedated during the period. Furthermore, both parents testified regarding Ryan's sudden turn for the worse, their visits to the hospital and attention to his condition, and the hours before and after his death. Both testified regarding the impact and lasting effects of his death. Certainly this evidence of the experiences of both Ryan and his parents supports the awards made. Given this evidence, we find no abuse of the vast discretion afforded the trier of fact in assessing damages, whether they be *168 for wrongful death or for the survival action.

Medical Expenses
The jury awarded $25,000 in medical expenses. The judgment entered reflected an award of $27,000 for "future medical expenses"[5] and indicated that the plaintiffs are entitled to recovery of expenses in addition to the statutory limit of the Medical Malpractice Act. In their answer to the appeal, the plaintiffs contend that the jury erred in awarding only $25,000 in medical expenses. They assert that the evidence clearly revealed that the medical expenses incurred as a result of the malpractice were $50,306.64. They reason that the jury may have become confused, believing that half of the expenses were related to Ryan's twin's hospital stay.
La.R.S. 40:1299.42(B)(1) provides: "The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost."
As for medical expenses, however, La. R.S. 40:1299.43 additionally provides:
B. (1) "Future medical care and related benefits" for the purpose of this Section means all reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services, after the date of injury.
. . . .
D. Payments for medical care and related benefits shall be paid by the patient's compensation fund without regard to the five hundred thousand dollar limitation imposed in R.S. 40:1299.42.
As suggested by the plaintiffs in their appeal, the evidence is clear that the medical expenses incurred as a result of the defendant's negligent conduct are $50,306.64. The only evidence regarding medical expenses was presented by the plaintiffs and is revealed in the following colloquy between Dr. Bossano and the plaintiffs' attorney:
Q One of the other things I asked you to do, doc,this is difficult, I know. But I was trying to figure out how do we determine how much of the medical costs in treating Ryan are relatable to the CMV.
Do you remember we had that conversation?
A Yes.
Q What I did was, we know we had two babies in the neonatal intensive care unit. Correct? Who were progressing somewhat similar. Is that a fair statement?
A Yeah. Lacy and Ryan, yes.
Q All right. We took the difference on the bills between Lacy and Ryan from the day they were born to the day Ryan died. And we compared those. Now, I've talked to you about this before.
A Yeah.
Q Do you believe that that is aabout the most reliable way that you can go back and try to reconstruct what the cost would have been to treat this child's CMV?
A I cannot think it any other way that would be better than that, yeah.
Q Okay. And that cost according to the bills is $50,306.64; is that correct? *169 If that's what the bills show, bills are in the record.
A Yeah, right.
As this is the totality of the evidence regarding medical expenses incurred as a result of the CMV, it was error for the jury to award only half of the only amount demonstrated by the record. Given the discussion as to those expenses incurred by Ryan's twin, it is reasonable to conclude that the jury awarded fifty percent of that claimed by the plaintiffs and that it erroneously concluded that half of that sought was attributable to Lacy. Any such presumption was incorrect. The record supports only the award for $50,306.64. When a plaintiff alleges the accrual of medical expenses and the allegation is supported by a bill, unless there is sufficient contradictory evidence or reasonable suspicion that the sum sought is unrelated to the tort, it is sufficient to support the inclusion of that expense in the judgment. Este' v. State Farm Ins. Co., 96-99 (La. App. 3 Cir. 7/10/96), 676 So.2d 850. Accordingly, as the plaintiffs have submitted the medical bills from the twins' hospital stay and Dr. Bossano's testimony puts those expenses in perspective with regard to those attributable to Ryan's care, we amend the judgment to reflect an increase in the amount of medical expenses awarded to reflect a figure of $50,306.64.
In its reply brief, the PCF contends that the plaintiffs failed to seek a special interrogatory regarding "future medical expenses." Thus, according to PCF, the amount awarded for medical expenses cannot be awarded outside of the $500,000 cap. In support of this argument, the PCF points to La.R.S. 40:1299.43(A)(1), which provides: "In all malpractice claims filed with the board which proceed to trial, the jury shall be given a special interrogatory asking if the patient is in need of future medical care and related benefits and the amount thereof." The absence of this interrogatory, the PCF contends, requires that the award of medical expenses be included within the statutory cap.
Without considering the correctness of this argument or the applicability of La. R.S. 40:1299.43(A)(1) to this award, we point out that this argument has been abandoned. Rule 2-12.4 of the Uniform Rules, Courts of Appeal provides that: "All specifications or assignments of error must be briefed. The court may consider as abandoned any specification or assignment of error which has not been briefed." Although its fourth assignment of error was listed as "[t]he award of future medical expenses was erroneous[,]" in the discussion/argument portion of its appellant brief, the PCF stated only that it reserved "this assignment of error for its reply brief in response to the plaintiffs' request for an increase in this award."
In its reply brief, the PCF did not respond to the plaintiffs' arguments regarding the inadequacy of the award for medical expenses as is suggested in its appellants' brief. Rather, the PCF took the opportunity of the reply brief, a brief from which the appellee has no unqualified right to respond, to make the wholly new argument that the figure awarded by the trial court should not have been awarded over and above the "cap" because it was for "future medical expenses" and was not made in response to the special interrogatory described in La. R.S. 40:1299.43(A)(1). This type of response is clearly contrary to Uniform Rule 2-12.6, which indicates that: "The appellant may file a reply brief, if he has timely filed an original brief, but it shall be strictly confined to rebuttal of points urged in the appellee's brief." (Emphasis added.) We have determined that the argument made in the reply brief, *170 which must necessarily remain unrebutted by the appellees, is not properly before the court and, therefore, must remain unconsidered.

Frivolous Appeal
Finally, the plaintiffs ask this court to impose damages for frivolous appeal. La. Code Civ.P. art. 2164 provides that "[t]he court may award damages for frivolous appeal; and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable."
While there is provision for such damages, the Louisiana Supreme Court has explained that appeals are favored, and that such damages are inappropriate unless the action is unquestionably frivolous. Hampton v. Greenfield, 618 So.2d 859 (La. 1993). The Court stated:
Damages for frivolous appeal are only allowed when "it is obvious that the appeal was taken solely for delay or that counsel is not sincere in the view of the law he advocates even though the court is of the opinion that such view is not meritorious." Parker v. Interstate Life & Accident Ins. Co., 248 La. 449, 179 So.2d 634, 636-37 (1965).
Id. at 862.
Our review of the questions presented indicates that, although the PCF's arguments are not meritorious, they are not so lacking in merit as to be deemed "unquestionably frivolous." We are unable to say either that this appeal was taken solely for delay, or that counsel is not of the view that the arguments advanced may be successful. Accordingly, we deny the request for damages in this regard.

DECREE
For the foregoing reasons, the judgment of the trial court is amended to reflect that medical expenses are awarded in the amount of $50,306.64. In all other respects the judgment is affirmed.
AFFIRMED AS AMENDED.
NOTES
[1] By a supplemental and amending petition, the plaintiffs also alleged entitlement to bystander damages under La.R.S. 2315.6. This claim was later withdrawn by the plaintiffs.
[2] La.R.S. 40:1299.42 provides, in part:

B. (1) The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost.
(2) A health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon accruing after April 1, 1991, for all malpractice claims because of injuries to or death of any one patient.
[3] Dr. Sperry explained that forensic pathology requires further training beyond that in anatomic and clinical pathology. He affirmed that it is the area of pathology focused on determining cause of death.
[4] The following colloquy between the attorney for PCF, Mr. Prudhomme, and the plaintiffs' attorney, Mr. Faircloth, is contained in a portion of the pretrial hearing held on the morning on the first day of trial:

MR. PRUDHOMME:
Up until last week we thought he was coming live. He calledwe subpoenaed him. Apparently, the hospital got the subpoena. The hospital did not call me.
They apparently contacted him in Idaho. And he called me and I asked him point blank, are you going to be available toare you going to be available to testify here in Lake Charles. And he said, no.
THE COURT:
And when waswhen did all this occur?
MR. PRUDHOMME:
Last week.
MR. FAIRCLOTH:
I'd done a depo, Judge.
THE COURT:
Why didn't we do something about it? That the question I have. Why didn't we contact the other side and at least make, you know, do a video or do a phone call deposition or something, or we'd get this witness available?
Because what you're telling me is you did a discovery deposition only.
MR. FAIRCLOTH:
That's it.
MR. PRUDHOMME:
That's correct, Your Honor.
MR. FAIRCLOTH:
And Your Honor, I think Keith asked very few questions. It was my discovery deposition.
THE COURT:
Yeah. Would have been better for you to be able to ask more, I'm sure, especially after some of the stuff that came out in the deposition.
I don't know how I can allow it to be used, Mr. Prudhomme, based upon what you've represented to the Court. Not saying that you tried to do anything wrong here, it's just you got sandbagged by your witness.
So I don't knowI don't know how you can do anything differently. If he's available for a deposition during the trial, you may want towe may want to takeafter we take a break at night, take a telephone deposition.
I'll allow that, that type of thing, where both side can ask questions of this witness. And I don't know how quick we can get it here, but I assume we could get it done pretty quick.
I don't have a problem with that because it was an anticipated witness here. This witness was anticipated.
So I will allow that if it'syou can set it up. Okay?
MR. PRUDHOMME:
Okay. Thank you, Your Honor.
[5] The jury's verdict reflects an award of $25,000 in medical expenses and $2,000 in funeral expenses. It is unclear from the record whether the $27,000 in future medical expenses is inclusive of the separate awards.