# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 07-44


MARIE LANGLINAIS, ET AL.

VERSUS

DR. RICHARD DEARMAN, ET AL.


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2003-5555
HONORABLE DURWOOD WAYNE CONQUE, DISTRICT JUDGE

**********

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, and Elizabeth A. Pickett, Judges.


                                                    **AFFIRMED.**


Alan K. Breaud
Timothy Wayne Basden
Breaud & Meyers
P. O. Drawer 3448
Lafayette, LA 70502
Telephone: (337) 266-2200
COUNSEL FOR:
    Defendants/Appellees - Louisiana Medical Mutual Ins. Co. and
    Richard Dearman, M.D.


Deborah Ellen Lavender
909 Poydras Street - Suite 2556
New Orleans, LA 70112
Telephone: (504) 525-4361
COUNSEL FOR:
    Plaintiffs/Appellants - Marie Langlinais and Larry Langlinais

**THIBODEAUX, Chief Judge.**

Plaintiffs, Marie and Larry Langlinais (the Langlinaises), appeal a judgment pursuant to a jury verdict finding that Dr. Richard Dearman (Dr. Dearman) did not breach the standard of care when performing coronary by-pass surgery on Mrs. Langlinais. The Langlinaises also appeal the denial of their motion in limine requesting that the trial court limit Dr. Dearman's ability to call all three members of the medical review panel as witnesses in his defense. For the following reasons, we affirm the trial court's denial of the motion in limine and the judgment in favor of Dr. Dearman.

I.

**ISSUES**

The Langlinaises assign as error the following two issues:

1. was the jury verdict finding that Dr. Dearman did not breach the standard of care clearly wrong based on the evidence, or clearly without evidentiary support?

2. did the trial court err when it denied the Langlinaises' Motion in Limine, asking that Dr. Dearman not be allowed to call all three members of the medical review panel as expert witnesses?

II.

**FACTS**

In February of 2001, Mrs. Langlinais went to her doctor complaining of chest pains, among other symptoms. Her doctor sent her to a cardiologist. The cardiologist administered an angiogram which revealed that an artery in her heart had severe blockage. She was diagnosed as having severe coronary artery disease called coronary atherosclerosis. The artery with the severe blockage is called the left anterior descending coronary artery (LAD), and it provides up to fifty-percent of the

blood flow to the heart. To correct the blockage, Mrs. Langlinais chose to undergo coronary by-pass surgery. The goal of that surgery was to circumvent the LAD, which was ninety-percent blocked. This would hopefully restore blood flow to the front part of her heart and alleviate her chest pains. Her cardiothoracic surgeon was Dr. Dearman, who was recommended to Mrs. Langlinais by her cardiologist.

Dr. Dearman intended to by-pass Mrs. Langlinais's LAD. Immediately after surgery, Mrs. Langlinais experienced relief from the symptoms which had originally brought her in to see her doctor.

In September of 2001, she began to experience chest pains again while dancing and during an exercise walk. An angiogram was performed. It was discovered that she was suffering from a new blockage. The angiogram also revealed that Dr. Dearman had by-passed the diagonal branch of the LAD instead of the main branch. The diagonal is an artery that branches off of the main branch of the LAD. This time the blockage was located in the diagonal branch.

The only viable option for her long-term survival was to undergo open heart surgery once again to circumvent the new blockage of the diagonal and the previous blockage of the LAD. While Dr. Dearman offered to perform another by-pass surgery on Mrs. Langlinais, she elected to have the surgery done by a different cardiothoracic surgeon.

After a successful surgery and recovery, the Langlinaises filed a complaint against Dr. Dearman with the Louisiana Patients' Compensation Fund. A medical review panel was convened in accordance with the requirements enumerated in La.R.S. 40:1299.47. The medical review panel opinion unanimously concluded that Dr. Dearman's actions did not breach the standard of care required of a cardiothoracic surgeon.

2

After receiving and reviewing the medical review panel opinion, the Langlinaises filed a medical malpractice claim in district court. A jury returned a verdict in favor of Dr. Dearman, concluding that he did not breach the standard of care required of a cardiothoracic surgeon. The Langlinaises filed a motion for a judgment notwithstanding the verdict which was denied. They then timely filed this appeal.

III.

## LAW AND DISCUSSION

### Standard of Review

The Supreme Court has set out in clear detail both the standard of review an appellate court must apply when evaluating a jury verdict, as well as the process that must be used when applying that standard of review.

> A trial court's findings of fact may not be reversed absent manifest error or unless clearly wrong. *Stobart v. State of Louisiana, through Dep't of Transp. and Dev.*, 92-1328 (La. 4/12/93), 617 So.2d 880. This court has a constitutional duty to review facts. *Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 93-3099, 93-3110, 93-3112 (La. 7/5/94), 639 So.2d 216. Because we have this duty, we must determine whether the verdict was clearly wrong based on the evidence, or clearly without evidentiary support. *Id*. The reviewing court must do more than just simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *Id*. at 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Id*. The reviewing court must always keep in mind that "if the trial court's or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id*. at 882-83 (citing *Housley v. Cerise*, 579 So.2d 973 (La.1991)) (quoting

> *Sistler v. Liberty Mutual Ins. Co.*, 558 So.2d 1106, 1112
> (La.1990)).

*Fusilier v. Dauterive*, 00-151, p. 5 (La. 7/14/00), 764 So.2d 74, 78.

The central question in this case is not whether Dr. Dearman made a mistake. All witnesses and parties, including Dr. Dearman, agree that the intended graft should have been to the LAD itself and not to the diagonal artery which branches off from it. Rather, the question to be answered is whether his actions in grafting the by-pass to the diagonal instead of the LAD constitute a breach in the standard of care required of physicians by Louisiana law.

The standard of care that Dr. Dearman must be held to is outlined by statute as follows:

> 2794. Physicians, dentists, optometrists, and chiropractic physicians; malpractice; burden of proof; jury charge; physician witness expert qualification
>
> A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., . . . the plaintiff shall have the burden of proving:
>
> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

La.R.S. 9:2794(A)(1).

The degree of knowledge or skill and care that Dr. Dearman must be held to is a national standard, as there are too few cardiologists in the state of Louisiana

to be considered "a similar community or locale and under similar circumstances" as required by the statute. *Id*.

The Louisiana Supreme Court has elaborated on the application of this standard.

> A physician is required to exercise that degree of skill ordinarily employed under similar circumstances by others in the profession and also to use reasonable care, diligence, and judgment. A physician is not required to exercise the highest degree of care possible; rather, his duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances.

*Fusilier v. Dauterive*, 764 So.2d at 79 (citations omitted).

The record in medical malpractice cases contains testimony of a number of expert witnesses. The trier of fact is in the best position to evaluate and weigh the testimony of expert witnesses. Therefore, the evaluations of credibility and the weight given to each expert's opinion by the trial court will be given great deference by a reviewing court. "When the expert opinions contradict concerning compliance with the applicable standard of care, the trial court's conclusions on this issue will be granted great deference. It is the sole province of the factfinder to evaluate the credibility of such experts and their testimony." *Charpentier v. Lammico Ins. Co.*, 606 So.2d 83, 87 (La.App. 3 Cir.1992).

**Was the Jury Verdict in Favor of Dr. Dearman Clearly Wrong and Unsupported by the Evidence and the Record?**

It is our duty to examine the entire record to answer the question of whether the jury verdict in favor of Dr. Dearman was supported by the evidence. Therefore, we will discuss the testimony and evidence in order to determine whether the jury's verdict was reasonable.

Dr. Dearman testified that he checked Mrs. Langlinais's angiogram directly before he commenced surgery on her. When he opened her chest and looked at her heart, the diagonal was approximately where he expected the LAD should be located based on the angiogram. The size of the diagonal met his expectation, based on prior experience, compared to the size of the LAD. Dr. Boustany, the surgeon performing the second open heart surgery on Mrs. Langlinais, stated that the LAD was actually only five tenths of a millimeter larger than the diagonal. Dr. Dearman stated in his deposition that every indicator suggested that he was grafting the by-pass to the LAD.

Dr. Boustany also stated that he found Mrs. Langlinais's LAD in the epicardial fat which covers the heart. He knew it was not in the location expected by viewing the angiogram as Dr. Dearman had already discovered that artery was the diagonal. He stated that angiograms are guides, not road maps. They are not precise and exact. Therefore, he knew he would need to look for the LAD. When the LAD is not readily visible it is often either in the epicardial fat surrounding the heart, or in the heart muscle itself. Dr. Boustany found the LAD located in the epicardial fat, approximately one inch from the location of the diagonal.

The surgery performed by Dr. Dearman on Mrs. Langlinais was done "off pump," meaning that she was not connected to a heart lung machine and her heart was beating on its own. All physicians testifying at trial, including the expert hired by the Langlinaises, agreed that off pump was the right choice for this first surgery since it was intended to by-pass only one artery. All experts stated that digging into the epicardial fat covering the heart in order to look for an artery was dangerous in an off pump operation. Among other complications, it could cause

6

bleeding, as well as fibrillations of the heart muscle. Fibrillations of the heart muscle could cause stroke, heart attack, and death.

The second open heart surgery performed by Dr. Boustany was done "on pump," meaning that a machine was artificially circulating Mrs. Langlinais's blood so that her heart would not be beating. It would remain unmoving during the surgery. He explained that "on pump" procedures are used when you are either re-operating or performing multiple by-passes. Therefore, digging in the epicardial fat surrounding her heart was less dangerous because the heart was not actively pumping blood and was in a relaxed state.

In retrospect, the second surgery seems to have resolved Mrs. Langlinais's problem regarding blockage of the LAD and diagonal, at least for these five plus years since that operation. All experts agreed that coronary atherosclerosis, the disease which causes the arteries of Mrs. Langlinais's heart to get clogged, is not curable. The blockages can be circumvented, but not prevented. There was no evidence presented that tended to show that Dr. Dearman's surgery created the subsequent blockage in the diagonal or necessitated the second surgery.

Mrs. Langlinais's cardiologist stated that the graft to the diagonal had solved her original problem because the diagonal was getting blood to the area of the heart previously deprived by the blockage in the LAD. He stated that the subsequent development of blockage in the diagonal was something that happens to people with coronary heart disease and could not be explained. He did not attribute the need for a second surgery to Dr. Dearman's by-pass graft to the diagonal.

The jury heard from five cardiothoracic surgeons and a cardiologist on whether, in their opinions, Dr. Dearman met or breached the standard of care required of a cardiothoracic surgeon. Three of those six believed that Dr. Dearman's mistake

did not breach the standard of care. Two of those six offered no opinion as to whether the jury should find that Dr. Dearman did or did not meet the standard of care. One cardiothoracic surgeon stated that he felt Dr. Dearman breached the standard of care. "As fact finders, it was the jury's role to consider the evidence and the differing expert opinions, make the necessary credibility determinations, and determine which evidence it found more compelling." *Fowler v. Bossano*, 01-357, p. 9 (La.App. 3 Cir. 10/3/01), 797 So.2d 160, 167.

However, all five of the testifying surgeons—including the one who believed that Dr. Dearman breached the standard of care—stated that it was likely that they each could have unwittingly made the same mistake that Dr. Dearman did without knowing it. Indeed, all of the cardiothoracic surgeons stated that they had chosen to graft a by-pass to the diagonal instead of the LAD in cases similar to the facts of Mrs. Langlinais's.

If a patient's symptoms resolve, a doctor would have no way of knowing that he or she had grafted a by-pass to the diagonal instead of the LAD as intended. Mrs. Langlinais's symptoms did resolve for a period of seven months. This indicated that the by-pass was providing adequate blood flow to the previously affected areas of her heart. Her new symptoms were attributed to the new blockage that was discovered in an artery other than the LAD.

Mrs. Langlinais's expert was asked on cross-examination by Dr. Dearman's attorney whether that opinion was supported by any writing or guideline created by the American Board of Thoracic Surgeons. The doctor answered, "I don't believe so."

The standard of care the jury was instructed to apply was whether Dr. Dearman acted reasonably under the circumstances existing at the time. The standard

of care is not based on the results achieved at a later time. The jury was instructed that unless they found that Dr. Dearman exercised the required care, skill and judgment in selecting and following the method that he chose, he should be found to have breached the standard of care. It was quite reasonable, based on reviewing all of the evidence in the record, for the jury to determine that Dr. Dearman acted reasonably under the circumstances.

Under the manifest error standard of review we cannot say that the jury was manifestly erroneous for believing the testimony of some experts over that of others. *Frederick v. Woman's Hosp. of Acadiana*, 626 So.2d 467 (La.App. 3 Cir. 1993), *writ denied*, 93-2991 (La. 2/4/94), 633 So.2d 169. Based upon these facts, it was reasonable for the jury to conclude that Dr. Dearman did not breach the standard of care when he did not dig through the epicardial fat to ensure he was grafting the LAD when all signs and signals suggested that the artery he was grafting was the intended artery. Therefore, we affirm the judgment of the trial court and find that Dr. Dearman did not breach the standard of care when he mistakenly grafted a by-pass to Mrs. Langlinais's diagonal branch instead of the LAD.

### Did the Trial Court Err in Denying the Langlinaises' Motion in Limine, Allowing All Three Medical Review Panel Members to Testify at Trial?

Louisiana Code of Evidence Article 702 gives the trial court great discretion when allowing specialized experts to testify if their testimony will help the trial court understand the evidence or determine a fact at issue. *Fowler*, 797 So.2d 160. Louisiana Code of Evidence Article 403 tempers that great discretion with the caveat that evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Only if a reviewing court finds that the trial court's judgment to allow multiple experts to testify was clearly erroneous will

9

that judgment be disturbed on appeal. *Hall v. Brookshire Bros., Ltd.*, 01-1506 (La.App. 3 Cir. 8/21/02), 831 So.2d 1010, *writs granted*, 02-2404, 02-2421 (La. 11/27/02), 831 So.2d 285, *aff'd by*, 02-2404 (La. 6/27/03), 848 So.2d 559.

Any party may call as a witness any member of the medical review panel. *Medine v. Roniger*, 03-3436 (La. 7/2/04), 879 So.2d 706. While the trial court is afforded great discretion in determining the admissibility of expert witness testimony, when that testimony may prove to be cumulative the trial court should make sure that the testimony fulfills three conditions:

> The first condition questions the relevance of the testimony to be elicited. The second seeks to ascertain that the fact finder will be aided by the testimony. The third, balancing the probative value of this testimony against substantial prejudice, confusion, or inefficiency, guards against undue removal of reason from the fact finding process, as well as waste. Want of any of the three is fatal to admission of an expert's unbridled testimony.

*Frederick*, 626 So.2d at 471.

Keeping these conditions in mind, we must remember our standard for reviewing the trial court's decision on the motion in limine. "The admission of cumulative evidence is at the trial court's discretion." *Mitchell v. Limoges*, 05-832, p. 3 (La.App. 3 Cir. 3/1/06), 923 So.2d 906, 908, *writ denied*, 06-723 (La. 6/16/06).

The Langlinaises contend that having all three members of the medical review panel testify prejudiced their case beyond repair because the jury was "counting noses." However, out of the six physicians testifying at trial either in person or via videotaped deposition testimony, each party had three testifying on their behalf. The Langlinaises called Dr. Boustany, Dr. Jeffrey Chen, Mrs. Langlinais's cardiologist, and Dr. Andrew Wechsler, the cardiothoracic surgeon hired to testify as an expert for the Langlinaises' case. Dr. Dearman called the three members of the medical review panel: Dr. Carlton Sheely, Dr. Nick Moustoukas, and Dr. Travis

10

Spears. All three of the doctors called by Dr. Dearman appeared because they were summoned by subpoena.

One cannot assume that because the medical review panel members have found that the defendant doctor has not breached the standard of care that all of those panel members will be biased towards the defendant doctor. In fact, in this case all of the members of the medical review panel were independent from Dr. Dearman. None of them had ever met Dr. Dearman, worked with him, or testified either for or against him before this case.

While each of the medical review panel members testifying were cardiothoracic surgeons, they all practiced in different parts of the state of Louisiana, none had ever worked with any of the others before, and each had different backgrounds and training.

The trial judge denied the motion in limine, with the observation that he was not going to allow each of the panel members to be repetitive.

Dr. Sheely was the first of the three medical review panel members to testify. Dr. Sheely trained with Dr. Michael DeBakey, the surgeon who was one of the first to perform cardiac by-pass surgery. Dr. Sheely stated that it is sometimes difficult to distinguish the LAD from the diagonal. He stated that it was his belief that the mistake Dr. Dearman made was a reasonable one and therefore did not rise to the level of malpractice. He also said that the new blockage would have required surgery even if the LAD had been grafted in the first surgery.

Before allowing either of the other two members of the medical review panel to testify, the trial judge instructed Dr. Dearman's attorney that the court was not going to allow each member of the panel to "parrot the findings of the medical review panel and the reasons why." The judge made clear that each subsequent

11

witness must have something different to say from the one that came before and after him.

While both statute (40:1299.47 (H)) and caselaw (*Medine* in particular) allow the defendant to call any member of the medical review panel to testify, the trial judge has discretion to limit those witnesses to avoid cumulative testimony. The trial judge did allow each member of the panel to state what each believed to be the standard of care for a cardiothoracic surgeon. The judge also recommended that Dr. Dearman's lawyer ask the two remaining medical review panel members if they agreed with what was said by Dr. Sheely, and then ask if they had anything to add.

The trial judge was ensuring that all three of the factors outlined in *Frederick* were met.

Dr. Moustoukas stated that all of the information Dr. Dearman had up to and at the time he performed the by-pass indicated that he was grafting the LAD. In support of that conclusion, Mrs. Langlinais's symptoms went away. If there were still a problem getting blood to the affected area of the heart, she would have had symptoms again very soon after surgery.

Dr. Spears stated that the surgeon performing the second cardiac by-pass had the benefit of Dr. Dearman's diagonal graft to serve as a road map to help him find the LAD. Dr. Spears believed that Dr. Dearman was right not to go digging in the epicardial fat surrounding Mrs. Langlinais's heart because that would have been a risky and possibly dangerous maneuver on a beating heart.

The Langlinaises' attorneys were able to cross-examine each of the three witnesses testifying for Dr. Dearman. And, as mentioned above, the Langlinaises presented the testimony of three expert witnesses of their own.

12

The anatomy of the heart is specialized and complex. Doctors require many years of study in order to understand its intricacies. If the trial judge wanted as much expert testimony to help himself and the jury understand the evidence and determine the facts at issue, he had great discretion to do so. In doing so, he also kept a very close watch on the testimony to ensure that it did not become cumulative to the point of prejudice to the Langlinaises' case.

Therefore, we find that the trial judge did not abuse his much discretion in denying the Langlinaises' motion in limine requesting that Dr. Dearman be limited to calling only one of the medical review panel members as a witness in his defense. Both parties had an equal number of physicians testifying on their behalf, and each of the witnesses added expertise that aided the trial judge and jury in determining the facts at issue in this case. The denial of the Langlinaises' motion in limine is affirmed.

## IV.

## <u>CONCLUSION</u>

A judgment pursuant to the verdict of a jury will not be overturned on appeal absent a showing, after review of the entire record, that the judgment was clearly wrong or not supported by the evidence. In this case, the jury's verdict that Dr. Dearman did not breach the standard of care when he by-passed Mrs. Langlinais's diagonal artery instead of the LAD as he intended was reasonable and supported by the evidence. As long as the verdict is reasonable and supported by the evidence, even if we would have come to a different conclusion, we cannot overturn that verdict. The jury's verdict in favor of Dr. Dearman is affirmed.

A trial judge has much discretion in determining whether to allow experts to testify, even when that testimony may be cumulative. The trial judge made

clear his reasons for allowing each of the three members of the medical review panel to testify on Dr. Dearman's behalf. The trial judge carefully presided over the direct examination of each of the panel members, and was clear that he would not allow mere recitation of the same testimony by each of these witnesses.

The trial judge did not abuse his much discretion, and the Langlinaises' case was not irreparably harmed by the testimony of the three medical review panel members. Especially in light of the fact that the Langlinaises were able to cross-examine each of the panel members and call an equal number of expert witnesses for their own case. The trial court's denial of the Langlinaises' motion in limine requesting that Dr. Dearman be limited to calling only one member of the medical review panel as a witness is affirmed.

The costs of this appeal are assessed against the plaintiffs, Marie and Larry Langlinais.

**AFFIRMED.**