NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 12-878


RYAN BREAUX, ET AL.

VERSUS

LOUISIANA PATIENT'S COMPENSATION FUND


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 75688
HONORABLE CHARLES LEE PORTER, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*


JOHN E. CONERY
JUDGE


\*\*\*\*\*\*\*\*\*\*


Court composed of John D. Saunders, Phyllis M. Keaty, and John E. Conery, Judges.


AFFIRMED.


Ian Alexander Macdonald
Nadia Marie de la Houssaye
Jones, Walker, Waechter, Poitevent,
Carrere & Denegre, L.L.P.
Post Office Drawer 3408
Lafayette, Louisiana 70502-3408
(337) 262-9000
COUNSEL FOR DEFENDANT/APPELLANT:
    Louisiana Patient's Compensation Fund

**Amy M. Winters**
**Jones, Walker, Waechter, Poitevent,**
**Carrere & Denegre, L.L.P.**
**201 St Charles Avenue, Suite 5100**
**New Orleans, Louisiana 70170-5100**
**(504) 582-8390**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Louisiana Patient's Compensation Fund**

**Joseph Elton Cullens  Jr.**
**Walters, Papillion, Thomas, Cullens, LLC**
**12345 Perkins Road, Bldg. 1**
**Baton Rouge, Louisiana  70810**
**(225) 236-3636**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Ryan Breaux**
    **Kelly Breaux**

**CONERY, Judge.**

Defendant, Louisiana Patient's Compensation Fund (PCF), appeals the verdict of the jury finding in favor of plaintiffs, Ryan and Kelly Breaux (the Breauxs), awarding survival and wrongful death damages for the death of their son, Talon Breaux, and medical expenses for the death of their daughter, Emma Breaux. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

On October 16, 2005, Emma and Talon Breaux were delivered by cesarean section at twenty-eight weeks of gestation at Lafayette General Medical Center (LGMC). They were directly transferred to the Neonatal Intensive Care unit of LGMC (NICU). While under the exclusive care of the NICU staff, the twins developed separate bacterial infections.

On October 29, 2005, Talon was infected with Pseudomonas aeruginosa and died on October 31, 2005. Emma was infected with Methicillin-Resistant Staph Aureus (MRSA). The MRSA caused the development of multiple mycotic aneurysms, requiring emergency surgery and extensive medical treatment.[1] Additionally, Emma later required surgery to lengthen one of her legs as a result of the aneurysms caused by the MRSA infection, which was scheduled and performed on July 23, 2009, at St. Mary's Medical Center in West Palm Beach, Florida. While in Florida awaiting her surgery, Emma was exposed to the H1N1 influenza virus (Swine Flu) and tested positive for the virus on July 27, 2009. Emma was then transferred to Miami Children's Hospital and battled the disease for six weeks before passing away on September 10, 2009, just shy of her fourth birthday.

---

[1] A mycotic aneurysm is defined as an infected aneurysm caused by a fungi. Dr. Jeffrey E. Galpin (Dr.Galpin) the Breauxs' expert, testified in detail to the relationship between the MRSA infection and the development of Emma's mycotic aneurysms, which were linked to the need for additional surgeries and put her at high risk for the HINI infection (Swine Flu) which caused her death.

On October 13, 2006, the Breauxs requested the formation of a medical review panel against LGMC and several other qualified healthcare providers (QHCP) involved in the treatment of Emma and Talon.[2] A Medical Review Panel (MRP) was formed, and, in 2009, after three years of discovery, LGMC admitted medical malpractice in the treatment of both Emma and Talon. LGMC agreed to pay $100,000.00 on behalf of each child, and, on November 13, 2009, the Breauxs filed a Petition to Approve Settlement of Medical Malpractice Claims and Admit Defendant's Liability with Reservation of Rights for Excess Damages Against the Louisiana Patient's Compensation Fund. Hearing was waived by all interested parties, and, on January 19, 2010, the trial court issued an Order approving the settlement. On April 23, 2010, the MRP for Emma's claims was dismissed. On April 26, 2010, the MRP for Talon's claims was also dismissed.

In February of 2010, the PCF agreed to pay a total of $500,000.00, which included the $400,000.00 statutory cap with accrued interest of $100,000.00, to settle the general damages portion of the wrongful death and survival action brought on behalf of Emma. No settlement was reached regarding any of the medical expenses incurred by the Breauxs on behalf of Emma, and the parties agreed to reserve this issue to the trial. Further, no settlement was reached between the parties with respect to any of the damages sought by the Breauxs for the wrongful death, survival action, and medical expenses claim brought on behalf of Talon. All issues remaining were scheduled for trial by jury.

After a four day jury trial, beginning on July 11, 2011, and ending on July 14, 2011, a verdict was returned in favor of the Breauxs against the PCF. The jury awarded the Breauxs the following: $4,053,370.50 in medical expenses on behalf of

---

[2] Louisiana Revised Statutes 40:1299.41(10) defines individuals and entities which are considered qualified health care providers. Louisiana Revised Statutes 40:1299.47 requires that all malpractice claims made against a qualified health care provider must first be initiated with a medical review panel.

2

Emma; $250,000.00 in survival action damages for pre-death suffering on behalf of Talon; $41,962.00 in medical expenses on behalf of Talon; $4,058.25 in funeral expenses on behalf of Talon; and $500,000.00 in damages to each parent for the wrongful death of Talon.

A final judgment was signed on August 10, 2011, reflecting the jury's verdict for all damages, with the exception of a reduction to $400.000.00 of the general damages to the Breauxs in the wrongful death and survival general damage claims on behalf of Talon, plus judicial interest from the date of demand, as required by the Louisiana Medical Malpractice Act.[3]

A motion for new trial was filed on August 22, 2011, by the PCF, alleging that the Breauxs had "impermissible contact and/or communication" with a member of the jury on Facebook during the trial. On October 7, 2011, the trial court held a hearing on PCF's post-trial motion and heard testimony from witnesses called on behalf of the Breauxs. The trial court denied the PCF's motion for new trial by judgment signed on October 7, 2011.

*Assignments of Error*

The PCF now appeals, asserting the following assignment of errors:

1. The jury verdict was tainted by plain and fundamental error of law which create [sic] an improper and erroneous inference, inflaming the sympathy of the jury.

2. The jury verdict was tainted due to a material error in the jury instructions that did not meet the evidence adduced at trial.

3. The jury's medical expense awards are clearly excessive as a result of fundamentally flawed jury instructions and plaintiffs' inclusion of expenses for treatment for pre-existing and unrelated conditions.

4. The jury's determination regarding the causal relationship between the MRSA infection and treatment for swine flu is manifestly erroneous, is not supported by the record and is contradicted by the medical records.

---

[3] *See* Louisiana Revised Statutes 40:1299.42(B)

5. The jury's awards of survival and wrongful death damages are based on erroneous instructions regarding plaintiffs' burden of proof, are excessive and manifestly erroneous.

## DISCUSSION

### *Jury Instructions*

In order for this court to review PCF's first, second, third, and fifth errors on appeal, we must first determine whether the PCF properly preserved its objections to the jury instructions and jury verdict form for appeal. Louisiana Code of Civil Procedure Article 1793(C) provides as follows:

> A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objections. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.

Furthermore, jurisprudence on this issue clearly "require[s] that the party asserting the objection must specifically state the objection on the record to preserve the objection as a potential assignment of error on appeal." Clay *v. Int'l. Harvester Co.*, 95-1572, pp. 11-12 (La.App. 3 Cir. 5/8/96), 674 So.2d 398, 406. *See also Busby v. St. Paul Ins. Co.*, 95-2128 (La.App. 1 Cir. 5/10/96), 673 So.2d 320, *writ denied,* 96-1519 (La. 9/20/96), 679 So.2d 443; *Guidry v. Dwight Manuel, Inc.*, 04-2031 (La. 11/17/04), 887 So.2d 456.

Louisiana Code of Civil Procedure Article 1793(B) provides: "The court shall inform the parties of its proposed action on the written requests and inform the parties of the instructions it intends to give to the jury at the close of the evidence within a reasonable time prior to their arguments to the jury."

With respect to the special verdict form and instructions, La.Code Civ.P. art. 1812(B) instructs as follows: "The court shall inform the parties within a reasonable

4

time prior to their argument to the jury of the special verdict form and instructions it intends to submit to the jury and the parties shall be given a reasonable opportunity to make objections."

The purpose of the requirement that a party object to the jury instructions and jury verdict form and state the grounds for its objection prior to submission to the jury is to allow the trial court the opportunity to take remedial action and rule on the objection, outside the presence of the jury, but while the jury is still present, and before the case is submitted to the jury for decision. La.Code Civ.P. art. 1793(C); *Sledge v. Cont'l Cas. Co.,* 25,770 (La.App. 2 Cir. 6/24/94), 639 So.2d 805.

A review of the record in this matter indicates that both parties submitted requested jury instructions to the trial court prior to trial. All counsel reviewed the trial court's final written jury instructions and the jury verdict form prior to their submission to the jury by the trial court, and there were no objections. Prior to the reading of the jury instructions by the trial court, the PCF made no specific or general objection to the jury instructions or the jury verdict form. No objection was lodged by the PCF after the reading of the jury instructions and jury verdict form prior to the beginning of deliberations. After the jury rendered its verdict against the PCF, the PCF made no objection to either the jury instructions or the special verdict form to the trial court. The PCF's post-trial motion for new trial likewise did not raise any objections to the jury instructions or verdict form. The record clearly demonstrates the PCF raised no objections to either the jury instructions or jury verdict form until appeal.

Because there were no objections to the jury instructions or jury verdict form made by the PCF as required by La.Code Civ.P. arts. 1793(C) and 1812(B) and the applicable jurisprudence, the PCF's objections contained within their first, second, third, and fifth assignment of errors were insufficiently preserved for appeal and must

5

be denied on those grounds alone. *See Guidry,* 887 So.2d 456. *See also Abshire v. Wilkenson*, 01-75 (La.App. 3 Cir. 5/30/01), 787 So.2d 1158; *Guilbeaux v. Hous. Auth. of City of Opelousas*, 07-1235 (La. App. 3 Cir. 3/5/08), 978 So.2d 1132, *writ denied*, 08-717 (La.5/30/08), 983 So. 2d 898. Moreover, after a review of the record, we do not find that the jury instructions or interrogatories "contain the kind of plain, fundamental error which might tempt us not to heed the language of article 1793." *Trans-Global Alloy Ltd. v. First Nat.l Bank of Jefferson Parish*, 583 So.2d 443, 448 (La.1991). The first, second, third, and fifth assignments of error will not be considered.

*Assignment of Error Four*

The PCF urges that the jury's determination regarding the causal relationship between the MRSA infection incurred by Emma while a patient at LGMC and her later treatment for the H1N1 virus (Swine Flu) was manifestly erroneous. In essence, the PCF claims that the MRSA infection contracted by Emma at LGMC in 2005 had no causal connection to her ultimate death from Swine Flu in 2009, and thus the medical expenses associated with her treatment for Swine Flu, or for that matter, for any medical expenses attributable to MRSA infection and subsequent treatment, should not have been awarded by the jury. The jury awarded the Breauxs over $3.2 million dollars in medical expenses for the treatment received by Emma Breaux at the Miami Children's hospital from July 29, 2009, after she contracted Swine Flu, until her death on September 10, 2009, plus additional expenses for the MRSA infection-related problems, totaling $4,053,370.50.

The PCF argues that the basis of the award of these medical expenses was "driven by sympathy, not medical evidence." The PCF argues that Dr. Galpin was the only physician who causally connected the death of Emma from Swine Flu to the admitted malpractice of LGMC and the MRSA infection.

6

The record shows that Dr. Galpin is a double board-certified physician in infectious disease and internal medicine, who has practiced for over forty years. Dr. Galpin was qualified by the trial court as an expert witness in internal medicine and infectious disease, and his exceptional qualifications and credentials are detailed in his curriculum vitae. Prior to the qualification of Dr. Galpin by the trial court there were no objections to his qualifications by the PCF.

In his testimony, Dr. Galpin opined that Emma's death from Swine Flu was the result of long-term damage to Emma's heart and lungs caused by the MRSA infection. Specifically, he testified that the immune lining of the heart and arteries were damaged, which, in turn, weakened her immune system. He further opined that the long-term intubation required while Emma was a patient at LGMC due to the damage to the arteries and heart caused by the MRSA infection also caused lung damage.

Dr. Galpin testified that MRSA often causes pneumatoceles—little holes or pockets in the lining of the lungs—that weaken the lungs, although he admitted that this damage is also a typical consequence of prematurity. He further explained that the damage to Emma's vascular system, heart, and arteries allowed the later-contracted Swine Flu to "track those areas," and, because of the MRSA, "her life was always at risk." Emma's arteries and heart were "immunologically inferior and defective," and she was "immunocompromised" resulting in a series of conditions that led to her death.

Dr. Galpin concluded that the surgery required for the leg-lengthening procedure contributed to the disease process by creating a "subway between H1N1 [Swine Flu] and the lung." According to Dr. Galpin, the MRSA infection contracted at LGMC led to aneurysms, and those aneurysms caused the leg length differential. Dr. Galpin further opined that leg length issue required the surgery in Florida where

Emma contracted Swine Flu, which caused her death and, thus, caused the Breauxs to incur a total of $4,079,530.50 in related medical expenses.

The PCF contends that Dr. Galpin's opinion is not supported by the medical evidence, as no other treating physician documented Emma's compromised immune system or made the Breauxs aware that this was a long term problem that required special precautions to maintain Emma in good health. However, the testimony presented at trial by the PCF failed to convince the jury that the conclusions of Dr. Galpin were not correct. If the jury accepted Dr. Galpin's testimony as credible, he made the required causal connection between the MRSA infection and the medical malpractice of LGMC and Emma's ultimate death from Swine Flu.

Although not addressed by the PCF, the expert testimony of Dr. Bradley D. Marino, M.D., M.P.P., M.S.C.E. (Dr. Marino), a triple board-certified physician in pediatrics, pediatric cardiology, and pediatric critical care, also supported the causal connection between the MRSA infection and the medical malpractice of LGMC and Emma's ultimate death from Swine Flu. Dr. Marino testified that he has practiced as a pediatric cardiologist since 2002 and is currently an attending physician at the cardiac ICU at Cincinnati Children's Hospital, where he has personally treated more than a hundred children with bacterial endocarditis like that suffered by Emma. The PCF also did not object to the acceptance of Dr. Marino by the trial court as an expert witness in pediatrics, pediatric cardiology, and pediatric critical care.

Dr. Marino testified live as a medical expert witness at trial and stated he routinely places umbilical arterial catheters (UACs), the identical type of catheter placed in Emma's heart at LGMC shortly after her birth. He estimated that he has personally placed "hundreds" of UACs during the course of his career and treated more than two thousand newborns with UACs in place.

During his testimony Dr. Marino utilized a digital animation of Emma's cardiovascular system to show how the MRSA infection caused her to develop multiple aneurysms. Dr. Marino refuted the PCF's medical expert, Dr. Bryan P. Barrilleaux's, contention that the extended placement of the UAC in Emma's heart was the exclusive cause of her multiple aneurysms. Dr. Marino testified that in the over two thousand neonates he has personally treated, he has "not seen a single one that had aneurysms like this with a UAC who didn't have endocarditis."

Like Dr. Galpin, Dr. Marino also testified to the causal connection between LGMC's malpractice and Emma's bacterial endocarditis, her multiple mycotic aneurysms, her malformed leg, her subsequent need for remedial surgery in Florida, and all of the subsequent medical treatment and her ultimate death. Dr. Marino testified that the presence of the "synthetic repair graphs" that were utilized to surgically repair Emma's aneurysms permanently compromised her immune system and placed her at greater risk to both acquire and to be unable to fight the Swine Flu infection which ultimately took her life.

The PCF's medical expert, Dr. Barrilleaux, is a board-certified emergency medicine and internal medicine physician. He has never treated a pediatric or neonatal patient, or one with an aneurysm, nor has he ever had an infectious disease practice. Dr. Barrilleaux attributed all of Emma's medical problems to the extended placement of the UAC at LGMC. Dr. Barrilleaux admitted he has only placed less than five UACs over the course of his career and had not placed one for more than a year prior to trial.

Dr. Barrilleaux, in essence, theorized to the jury that Emma did not have bacterial endocarditis caused by the MRSA. Her aneurysms were not caused by MRSA and they were not mycotic in nature. He further testified "there's no reason to believe that her immune system was affected at all by the several days of infection

with the MRSA that she had." The only cause of her multiple aneurysms, he opined, was the extended placement of the UAC during Emma's stay in the NICU of LGMC.

The PCF's appeal with respect to the fourth assignment of error is "based on the jury's award of virtually *all* medical expenses incurred after November 2, 2005, and the relationship between the malpractice and Emma's exposure to and illness/death from Swine Flu as the verdict is not supported by the record and is an abuse of discretion." November 2, 2005 is the date that Emma first tested positive for MRSA. The testimony of the Breauxs' highly- qualified experts, Dr. Galpin and Dr. Marino, clearly supports the jury's conclusion that all of the subsequent medical treatment rendered to Emma after she contracted the MRSA while in the NICU unit at LGMC, including her treatment for Swine Flu, was causally related to LGMC's malpractice.

The PCF presented evidence to the jury that Emma's recoverable damages for the MRSA infection totaled only $88,570.05. The Breauxs submitted the testimony of their expert, Dr. Galpin, who scrutinized the applicable medical invoices of Emma Breaux, assisted by two other witnesses, Pam Farmer RN, MSN, MS-BC, CLNC (Nurse Farmer) and Tommie J. Ashby, RN, MSN, CCRN, CLNC (Nurse Ashby) in order to determine the total amount of medical expenses related to Emma's MRSA infection. Dr. Galpin testified that the medical expenses caused by LGMC's malpractice, Emma's MRSA infection, the resulting complications, Swine Flu, and death totaled $4,053,370.50, all of which he and Dr. Marino testified were casually related to LGMC's fault.

As explained in *Esté v. State Farm Insurance Co*., 96-99 (La.App. 3 Cir. 7/10/96), 676 So.2d 850, a plaintiff may recover past medical expenses caused by a defendant's substandard conduct. However, the plaintiff bears the burden of proving "that, more probable than not, the medical treatment was necessitated by trauma

suffered in the accident." *Id.* at 857. *See also Fowler v. Bossano*, 01-0357 (La.App. 3 Cir. 10/3/01), 797 So.2d 160; *Smith v. Clement*, 01-87 (La.App. 3 Cir. 10/3/01), 797 So.2d 151, *writ denied*, 01-2878 (La. 1/25/02), 807 So.2d 249, *writ denied*, 01-2982 (La. 1/25/02), 807 So.2d 843. Furthermore, "When a plaintiff alleges that medical expenses were incurred and that allegation is supported by a bill, unless there is sufficient contradictory evidence or reasonable suspicion that the bill is unrelated to the accident, it is sufficient to support the inclusion of that item in the judgment." *Esté,* 676 So.2d at 857. A jury errs if it fails to award the full amount of medical expenses incurred as a result of the underlying malpractice and proven by a preponderance of the evidence. *Fowler*, 797 So.2d 160.

The jury found the testimony of the Breauxs' experts, both as to medical causation and as to the necessity for the medical treatment received by Emma, to be credible. Its findings are supported by the record and are not "manifestly erroneous." To the contrary, the jury chose not to believe the testimony of Dr. Barrilleaux. The jury's decision on credibility of the witnesses, particularly when supported by the exhibits in evidence, will not be disturbed on appeal. For the reasons stated, the PCF's fourth assignment of error is without merit.

## CONCLUSION

For the forgoing reasons, we affirm the jury's judgment awarding Ryan and Kelly Breaux $4,053,370.50 in medical expenses on behalf of Emma Breaux; $41,962.00 in medical expenses on behalf of Talon Breaux; $4,058.25 in funeral expenses on behalf of Talon Breaux; and the statutorily imposed general damage cap of $400,000.00 for the wrongful death and survival action general damage claim on

behalf of Talon Breaux, plus judicial interest from the date of judicial demand until paid. All costs of this appeal are assessed against Appellant, Louisiana Patient's Compensation Fund.

**AFFIRMED.**